**In re KELLY S.**

**No. 96–425–Appeal.**

Supreme Court of Rhode Island.

July 31, 1998.

Frank P. Iacono, Jr.; Anthony E. Angeli, Jr., Providence; Thomas J. Corrigan, Jr., for plaintiff.

Paula Rosin, Paula Lynch Hardiman, Joseph Victor Smith, Providence, for defendant.

Before WEISBERGER, C.J., and LEDERBERG, FLANDERS and GOLDBERG, JJ.

## OPINION

GOLDBERG, Justice.

This case came before the Supreme Court from a Family Court decree terminating the parental rights of the respondents to their minor child Kelly. Even though Kelly was born on May 4, 1990, the trial justice correctly observed that Kelly's plight originated in March 1987, as set forth in *In re Jean Marie W.*, 559 A.2d 625 (R.I.1989).

In *In re Jean Marie W.* we affirmed a Family Court decree that terminated the parental rights of Kelly's mother to her two older children who were born in 1982 and 1985.[1] *Id.* at 627. The horrific facts of that

---

1. Kelly's father, who is also the subject of the instant termination decree, was not a party to the previous action. We also note that throughout this opinion we shall refer to the individual respondents as "mother" and "father" and that both appeal from the trial justice's termination

case revealed that mother "had inflicted, or allowed to be inflicted, upon her children physical injury and sexual abuse and that the children were without proper parental care and supervision." *Id.* at 629. In particular we noted that mother's two children, aged one and four, were infested with lice and fleas, as well as being infected with sexually transmitted diseases. *Id.* at 627–28. Furthermore, laboratory tests on the younger child's urine indicated the presence of cocaine metabolites. *Id.* at 628.

Less than one year after we affirmed the termination decree in *In re Jean Marie W.*, mother gave birth to Kelly. Shortly thereafter, in July 1990, Janet Freniere (Freniere), a child protective investigator, was assigned to explore allegations that Kelly was being neglected. These allegations were determined to be unfounded, however, and the case was subsequently closed.

All remained uneventful until early 1994 when the Office of the Child Advocate requested that the Department of Children, Youth and Families (DCYF or the department) reevaluate mother's parenting skills. The department assigned Susan Varon (Varon), a social worker, to determine if services were needed. In particular, Varon offered mother sex-offender counseling in light of mother's prior history and Varon's determination that mother had not previously obtained such counseling.

Varon made her first visit to mother's home on February 28, 1994. There she was greeted by father and informed that mother was not at home because she was attending classes at Dorcas Place and that Kelly was not at home because she was in day care. Shortly thereafter father called Varon and informed her that he did not want Varon coming to his home, and that should Varon come into his home again, she would be at risk.

Nevertheless, Varon developed a case plan dated March 31, 1994, which identified as its objective that mother acknowledge her sexual-abuse perpetration. In addition the de-

partment asked mother to learn to understand the causes and effects of sexual-abuse, to recognize the need to seek help for sexually abusive behavior, to cooperate with a perpetrator evaluation, and to follow the evaluator's recommendations. Furthermore, the department asked that both parents maintain a safe and stable home environment for Kelly and requested that both parents also cooperate with DCYF. Thereafter, Varon referred mother and father to John Parsons, M.D. (Dr. Parsons), for the purposes of assessing their psychological function and their capacity to parent.

Doctor Parsons stated that he was unable to complete father's evaluation because he had become irritable and obnoxious and had refused to comply. This lack of cooperation, as well as displays of inappropriate behavior, were ongoing themes. For instance, during one interview father stated that he could control his temper and, as an example, explained that "he [could] stop[ ] beating them" before "taking them out" or "killing them." Father also admitted to pulling Kelly's hair, as well as threatening to blow up DCYF, the Office of the Child Advocate, and the Family Court building. On several occasions while in Kelly's presence, father would exhibit angry behavior. In addition, father repeatedly failed to follow through with medical treatment after having been diagnosed with paranoid schizophrenia in 1983.

Similar concerns were also expressed with respect to mother. Specifically, Dr. Parsons expressed his "very, very serious concerns" regarding mother's previous history of having sexually abused her children and her admission that she was heavily dependent upon cocaine. These two factors, Dr. Parsons opined, combined with the lack of any records indicating treatment for either problem, "would place [Kelly] at potentially, at high risk." Furthermore Dr. Parsons, like Freniere, noted that despite mother's documented history of abuse, she has continued to deny having abused or neglected her older children.[2]

decree. Only mother, however, has filed a brief with this Court, whereas father has filed a stipulation adopting the arguments as set forth in mother's brief. Therefore, although our analysis

may only refer to mother, it applies equally to both respondents.

**2.** Several months after Dr. Parsons' testimony, Freniere testified that mother admitted to her

In October 1994 Kelly was evaluated by Kathleen Newman (Newman), a general psychotherapist who evaluates and treats sexually abused children. At the time the evaluations with Newman began, Kelly was living with her mother, and according to Varon's testimony, there were no so-called red flags to suggest any problems in the mother-daughter relationship. Nonetheless during their first session Newman found Kelly to be very demanding and unusually affectionate. During their second meeting Newman used an anatomically correct doll and testified that Kelly seemed to focus on the breasts of the doll and recalled that Kelly spontaneously stated that "mommy doesn't touch boobies," which Newman characterized as "unusual." In the third session Kelly, who at the time was four years old, stated that "[m]ommy touched my boobies," and when asked by Newman to demonstrate her mother's actions, Kelly squeezed, twisted, and pushed down on the breasts of the doll. When Newman inquired further, however, Kelly then became anxious and modified her previous statement by stating, "Oh, no, only push them down." Thereafter Newman testified that Kelly placed her mouth over the vaginal area of the doll. Newman queried whether someone had ever done this to Kelly, whereupon she responded, "Yeah, my mommy does *** [s]he put it here," and Kelly placed her mouth over the doll's navel area. It was after this third session that Newman called Varon, described the aforementioned nonverbal disclosures, and requested that Kelly be removed from her mother's home. Kelly was removed from her mother's home on that day, October 4, 1994, and has not returned. Following a fourth session Newman concluded that there was a "high likelihood" that Kelly was the victim of sexual-abuse.

In late 1994 mother was referred to Myles Glatter (Glatter), a clinical social worker specializing in sex-offender treatment. Glatter testified that mother was dedicated to rehabilitating herself as a parent and noted that she had been free from drugs and alcohol, that she had been going to counseling, and that she had been attending supervised visits with Kelly. It is significant, however, that mother once again denied that she had sexually abused her older children, and Glatter noted mother's lack of remorse. Glatter testified that he and mother "did talk about responsibility, and that it almost seemed like she was kind of a passive observer, that she didn't seem to—when we talked about it—kind of feel responsible, or feel, you know, that she had really messed up and that somehow her actions had led to the removal of her children and the abuse of her children." Glatter concluded that an acknowledgment of responsibility is essential to mother's successful treatment.

On March 24, 1995, the department filed a termination-of-parental-rights petition, which for purposes of trial was consolidated, over respondents' objection, with a previously filed abuse/neglect petition. The termination petition alleged, *inter alia*, that (1) the parents had committed or had allowed to be committed toward any child conduct of a cruel and abusive nature, (2) Kelly had been placed with DCYF, the court had previously terminated parental rights to another child who is a member of the same family, the mother continued to lack the ability or the willingness to respond to services for rehabilitation, and the court found it improbable that an additional period of services would result in reunification within a reasonable length of time, considering Kelly's age and need for permanency, and (3) father was unfit by reason of emotional illness, mental illness, mental deficiency, or institutionalization for a duration rendering it improbable for father to care for Kelly for an extended period.

After hearing testimony that spanned nearly one year, the trial justice reviewed the evidence and gave great weight to the medical records that indicated that father had failed to follow through with treatment for paranoid schizophrenia. Thus the trial justice terminated father's parental rights to Kelly "by reason of serious mental illness, specifically paranoid schizophrenia." Regarding mother, the trial justice noted that

that she had spent five months at the Adult Correctional Institutions for sexually abusing her two older children. Mother, however, has repeatedly and adamantly denied not only having made this statement but also having sexually abused her older children.

Glatter was "someone who really champions her." Furthermore, despite Newman's opinion that Kelly was the victim of sexual-abuse, the trial justice specifically stated that she could not find that mother had sexually abused Kelly. Nonetheless, despite successful rehabilitative efforts, the trial justice focused her decision on the fact that in the nine years since mother's actions concerning her older children first came to light, she "has yet to assume responsibility for what occurred." Consequently mother's parental rights to Kelly were also terminated. This appeal ensued.

On appeal mother first alleges that G.L. 1956 § 15–7–7(1)(b)(ii) (now § 15–7–7(a)(2)(ii) [3]) is unconstitutional on its face and as applied in this case because like an Illinois statute struck down by the United States Supreme Court, § 15–7–7(a)(2)(ii) creates an irrebuttable presumption that a parent is unfit on the basis of past conduct without considering subsequent circumstances. In *Stanley v.. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), the Supreme Court declared unconstitutional a statute that created an irrebuttable presumption that unmarried fathers were unfit to raise their children without first conducting a hearing on parental fitness or requiring proof of neglect. Mother attempts to analogize the instant case to *Stanley* by arguing that pursuant to § 15–7–7(a)(2)(ii) once a parent is found to be unfit by reason of cruel and abusive conduct toward any child, a parent's rights to subsequent children may be terminated without any consideration of intervening circumstances. We do not read § 15–7–7(a)(2)(ii) so broadly.

■ Earlier this term we had the opportunity to review a Family Court decree terminating parental rights brought pursuant to § 15–7–7(1)(b)(ii). *See In re Nicole B.,* 703 A.2d 612 (R.I.1997). In affirming the termination decree, we observed that "it is both appropriate and permissible for a Family Court justice to *consider* earlier determina-

tions concerning the neglect or abuse of one child in determining the parents' fitness, or lack thereof, concerning other children entrusted to their care and that 'evidence of harm to one child of a family is relevant to the issues raised by a dependency-and-neglect petition regarding another child of the family.'" *Id.* at 618 (quoting *In re Luz J.,* 447 A.2d 1148, 1152 (R.I.1982)). (Emphases added.) Thus, although we are of the opinion that abusive conduct toward one child must be seriously considered as a factor detrimental to a parent's fitness with regard to another child and that the threshold of evidence with regard to this other child is diminished in the face of such horrific prior actions, past actions alone are not sufficient to brand a parent unfit for life. Therefore, we conclude that § 15–7–7(a)(2)(ii) passes constitutional muster on its face. Likewise, we are also satisfied that in this case mother was given every opportunity to present evidence concerning her parental fitness.

■ Testimony was elicited from several witnesses throughout the nine-day hearing regarding mother's rehabilitation, namely, her recovery from substance abuse, her participation in parenting classes, and her willingness to seek counseling. In addition the trial justice specifically acknowledged Glatter as "someone who really champions her" and noted that despite Newman's opinion that Kelly was the victim of sexual-abuse, there was no evidence to support this conclusion. We find it noteworthy, however, as we shall discuss *infra,* that the motivating factor behind the trial justice's termination decree was not mother's past conduct but actually mother's continued failure to accept responsibility for these past actions. In sum, unlike *Stanley,* mother was given every opportunity to present evidence concerning her parental fitness, and indeed she did present such evidence. Her inability to present evidence concerning her lack of remorse, however,

---

**3.** General Laws 1956 § 15–7–7(a) provides in pertinent part:

"(2) the parent is unfit by reason of conduct or conditions seriously detrimental to the child; such as, but not limited to, the following:

\*\*\*

(ii) Conduct toward any child of a cruel or abusive nature."

does not render § 15–7–7(a)(2)(ii) unconstitutional.

Mother next contends that the trial justice's finding that DCYF had satisfied its burden of proof was clearly erroneous. We disagree. Section 15–7–7(a)(2) [4] provides that a "parent is unfit by reason of conduct or conditions seriously detrimental to the child," which include the following:

"(iv) The child has been placed with the department for children, youth, and families and the court has previously terminated parental rights to another child who is a member of the same family and the parent continues to lack the ability or willingness to respond to services, which would rehabilitate the parent and provided further that the court finds it is improbable that an additional period of services would result in reunification within a reasonable period of time considering the child's age and the need for a permanent home."

■ It is well settled that when reviewing a decree of the Family Court, the trial justice's findings are entitled to great weight and shall not be disturbed unless the findings are clearly wrong or unless the trial justice overlooked or misconceived material evidence. *See In re Nicole B.*, 703 A.2d at 615. Consequently we examine the record to determine whether any legally competent evidence exists to support the trial justice's findings. *Id.* (citing *In re Frances*, 505 A.2d 1380, 1384 (R.I.1986)).

■ Here the trial justice reviewed father's medical records, which indicated a 1983 diagnosis of paranoid schizophrenia, and correctly observed that father has repeatedly failed to follow through with treatment. Furthermore the trial testimony clearly indicated that father had been uncooperative throughout the department's involvement in this case despite his awareness of an ongoing evaluation to determine his parental fitness. The trial justice was satisfied that father was unfit by reason of serious mental illness, that DCYF had made reasonable efforts to assist father in overcoming his limitations, and that

termination of father's parental rights was in Kelly's best interest. We agree.

■ Likewise, with regard to mother, we are equally satisfied that competent evidence supports the trial justice's findings. Mother's principal contention is that the trial justice erred in finding that she lacked "the ability or willingness to respond to services which would rehabilitate the parent" and that it was "improbable that an additional period of services would result in reunification within a reasonable period of time." In addressing this argument, mother points to her rehabilitative efforts, namely, substance-abuse treatment, sex-offender counseling, educational and parenting classes, separating from Kelly's father, and her general willingness to do anything for Kelly's benefit. We acknowledge these efforts, but mother overlooks one vital impediment that she has not been able to overcome—her continued failure to accept responsibility for her prior conduct, which contributed to the horrific abuse of her two older children.

During the trial no fewer than three witnesses testified that mother repeatedly and adamantly denied sexually abusing her older children. Even Glatter, who "championed" mother's progress, testified that she has not accepted responsibility for her prior actions and seemed to describe her role as almost a passive observer. More importantly Glatter testified that "it is very difficult to—to successfully treat someone who is in denial" and opined that acknowledging responsibility is essential to treatment. As the trial justice stated, "as long as [mother] does not recognize her actions and acknowledge her responsibility for what occurred to her other [children], Kelly would be at serious risk of suffering similar victimization by others." After carefully reviewing the record in this case, we agree.

■ Mother also contends that a condition precedent to § 15–7–7(a)(2)(iv), namely, that Kelly officially be placed with DCYF, was not satisfied. This argument, however, is also without merit. The record indicates that Kelly was removed from her mother's care

4. Mother's brief refers to this section as § 15–7–7(1)(b). The 1996 Reenactment redesignated this section as § 15–7–7(a)(2), which is how we shall refer to it.

on October 4, 1994, and that DCYF filed an abuse/neglect petition the following day. On October 11, 1994, DCYF was awarded temporary custody of Kelly, and on October 24, 1994, probable cause was found to continue the detention. The termination petition was filed on March 24, 1995. In addition, even though respondents did not receive notice of the termination petition until the day trial commenced, we are of the opinion that consolidation of the two petitions did not constitute reversible error.

The factual basis for both the abuse/neglect petition and the termination petition lay in the same source of conduct; therefore, additional discovery would not have been helpful. In addition, although DCYF failed to provide a statement of facts supporting the termination petition at the start of trial, the termination petition itself set forth the specific statutory grounds upon which the department was proceeding. Furthermore, on the first day of trial the court heard testimony from only one witness. The case was then continued for one month, and by the time trial resumed, the department had provided respondents with a factual statement supporting the termination petition. Therefore, after careful consideration of the entire record, which spanned nearly one year, we are satisfied that respondents have suffered no prejudice.

Last, we consider whether the trial justice erred in allowing Newman to express her opinion that without acknowledging her prior actions, mother had a zero likelihood of rehabilitation. In particular mother argues that Newman's testimony was elicited without a proper foundation since the two had never met or even spoken. Mother further argues that Newman's testimony that Kelly was the victim of sexual-abuse constituted impermissible hearsay since this testimony was gained by means of the use of an anatomically correct doll. *See In re Jean Marie W.*, 559 A.2d at 629.

Although we are in general agreement that Newman's testimony was less than impressive and in fact bordered on legal incompetency, we are of the opinion that her testimony played little or no role in the trial justice's decision. Despite Newman's repeated asser-

tions that Kelly was the victim of sexual-abuse, the trial justice discounted her testimony and expressly stated, "I am not certain, nor will I find, that this mother sexually abused Kelly." Furthermore, even if we assume that Newman's testimony concerning mother's chances of rehabilitation was improper, this testimony is of little moment since Glatter, a clinical social worker familiar with mother, arrived at the same conclusion.

█ In affirming the termination decree, we observe that although parents enjoy a fundamental liberty interest in the " 'care, custody, and management' " of their children, *see Santosky v. Kramer*, 455 U.S. 745, 758, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599, 610 (1982), "a child also has a fundamental interest in the security of his person, physical well-being, and access to a minimal supply of the basic necessities of life." *In re Lester*, 417 A.2d 877, 880 (R.I.1980). Accordingly " '[t]he state, under the scrutiny of the court, need not wait until a child's life has been permanently and irretrievably impaired before acting.' " *Id.* at 881. *See also In re Lee*, 442 A.2d 893, 898 (R.I.1982) (Weisberger, J., concurring) (" 'The state's role in protecting children may properly be preventive of harm as well as remedial' "). Kelly is now eight years old, and since this ordeal began in October 1994, she has stayed in four foster homes. We are thus convinced, as was the trial justice, that Kelly's best interests will be served by terminating the respondents' parental rights, thereby enabling Kelly to enjoy the permanency she deserves.

For the foregoing reasons the appeal is denied and dismissed. The decree of the Family Court terminating both mother's and father's parental rights is affirmed. The papers in this case may be remanded to the Family Court.

BOURCIER, J., did not participate.