**In re CORRYN B.**

No. 2006–81–Appeal.

Supreme Court of Rhode Island.

Jan. 26, 2007.

Marie T. Roebuck, Esq., Providence, for Petitioner.

Karen Clark, Esq., for DCYF.

Frank P. Iacono, Jr., Esq., Providence, for CASA.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice SUTTELL, for the Court.

In 1995, the respondent, Michael B., was found guilty by a jury of assault with a dangerous weapon (his hands) upon his five-week-old son. In 2003, the Department of Children, Youth and Families (DCYF) learned that the respondent was about to become a father again. Having determined that his history of violence against children merited preemptive measures, DCYF dispatched letters to all area hospitals requesting notification if and when the respondent's wife gave birth. Shortly after her birth on December 1, 2003, Corryn was removed from her parents' care and custody in light of her mother's unwillingness to separate from the respondent. On February 13, 2004, DCYF filed a petition to terminate his parental rights to Corryn on the ground that he is unfit by reason of conduct or conditions seriously detrimental to the child, such as "[c]onduct toward any child of a cruel or abusive nature." G.L.1956 § 15–7–7(a)(2)(ii). After trial, the trial justice, unconvinced that the respondent had taken any responsibility for his past transgressions, terminated his parental rights to Corryn.

The respondent now appeals, contending that the trial justice abused her discretion by (1) basing the termination exclusively on a prior conviction for abusive conduct; (2) shifting to respondent the burden of proving by "clear and convincing evidence" that he was a fit parent; (3) allowing a witness, qualified as an expert, to offer an opinion in response to a hypothetical question that did not contain all pertinent and undisputed facts; and (4) allowing into evidence the expert's report that contained inadmissible hearsay.

This case came before the Supreme Court for oral argument under an order directing the parties to show cause why the issues raised in this appeal should not summarily be decided. After examining the record and carefully considering the parties' written and oral submissions, we conclude that further explication is unnecessary. We shall, therefore, decide the appeal at this time. For the reasons set forth in this opinion, we affirm the decree of the Family Court.

## I

### Facts and Procedural History

The circumstances underlying the assault for which respondent was convicted before Corryn was born are indeed horrific and disturbing. His son was five weeks old when he was treated at Kent County Hospital in October 1993 for extensive injuries that left him with permanent brain damage. The infant was in cardiac arrest when he arrived at the hospital, and medical records indicate that he suffered two skull fractures, bleeding behind his eye, two wrist fractures, over twenty rib frac-

tures, two compressed vertebrae and a lacerated liver. Following his conviction, respondent received a sentence of twenty years imprisonment, with ten years to serve.

At the termination hearing for Corryn B., DCYF presented evidence that it had also investigated respondent in May 1992 for abusing the four-year-old daughter of his former girlfriend. The child suffered bruises to her back, leg, and arms, as well as a spiral fracture to her leg. Although neither respondent nor the child's mother faced criminal charges as a result, DCYF "indicated"[1] respondent for abuse and the mother for neglect and failure to supervise.

The respondent was released from the Adult Correctional Institutions in 2002. Shortly thereafter, respondent married Erin, who soon became pregnant. DCYF received information about respondent's impending fatherhood and, after a review of his record, sent out letters to area hospitals requesting a call to the child abuse hotline when respondent's child was born. On December 1, 2003, Maryann Campbell, the DCYF child protective investigator assigned to the case, received word that Corryn had been born at Kent County Hospital. Ms. Campbell went to the hospital that same day and informed respondent and his wife that because of respondent's history of abuse, DCYF was conducting an investigation.

After apprising the couple of DCYF's concerns, Ms. Campbell informed Corryn's mother that DCYF would seek to remove Corryn if respondent remained in their home. After the couple voiced their intention to continue living together, Ms. Campbell continued her investigation. DCYF filed an *ex parte* neglect petition against both parents on December 3, 2003, and placed Corryn in non-relative foster care. On January 2, 2004, however, DCYF placed the baby with her maternal grandmother. Sometime later, Corryn's mother was permitted to reside in the same home as well.

On February 13, 2004, DCYF filed an involuntary termination of parental rights petition against respondent only. In compliance with DCYF requests, respondent met with Dr. Norman Du Pont for psychological evaluation on five separate occasions that January and February. Doctor Du Pont reported that he did not believe respondent posed a threat to Corryn, and he recommended that steps be taken toward restoring his parental and custodial rights. In spite of this recommendation, DCYF moved forward with its termination petition.

In April 2004, the Family Court ordered DCYF to provide respondent supervised visitation with Corryn. The visits occurred once every other week and lasted for an hour. Pamela McLaughlin, Corryn's social caseworker, testified that respondent's conduct and interaction with his daughter during these visits was appropriate and affectionate.

A trial on both the neglect petition and termination petition commenced in Family Court on December 10, 2004. The trial justice heard testimony from respondent and his wife, their pastor, several DCYF workers, and two licensed clinical psychologists. At one point during the trial, DCYF's attorney called upon Dr. John Parsons, one of the aforementioned clinical psychologists, to respond to a hypothetical

---

1. In the vernacular of DCYF regulations, "indicated" means that a child abuse investigator has substantiated an allegation of abuse and/or neglect by a preponderance of the evidence after conducting an investigation. *See* 11 R.I.Code R. §§ 500.0010 and 500.0080 (Weil 2005).

question about the extent to which a person with respondent's history and circumstances might pose a threat to a five-month-old child.[2] The trial justice allowed the question, over the objection of respondent's counsel. Doctor Parsons, who had interviewed respondent's wife, but had never met respondent, indicated that the scenario put forth in the hypothetical indicated a "high risk situation." The hypothetical question did not indicate that its abstract subject had attended some anger management and parenting classes—an aspect of respondent's "profile" that was not yet in evidence at the time the question was posed.

At the trial's conclusion, the Family Court justice granted DCYF's termination petition, finding respondent unfit to parent Corryn "by reason of conduct or conditions seriously detrimental to the child in that [he] has committed conduct towards his other child of a cruel and abusive nature" within the meaning of § 15–7–7(a)(2)(ii). A decree terminating respondent's parental rights was entered on September 22, 2005, and this appeal ensued.

## II

### Standard of Review

■ Section 15–7–7(a) lists the findings of fact upon which the Family Court

may determine a parent to be unfit, and requires the termination of "any and all legal rights of the parent to the child" once the court has established one or more of the enumerated facts "by clear and convincing evidence." In reviewing decisions of a trial justice to terminate parental rights, this Court applies a very deferential standard:

> " 'On review of cases involving the termination of parental rights, this court must examine the record to determine if legally competent evidence exists to support the trial justice's findings.' * * * A finding of parental unfitness under § 15–7–7(a)(2) made by a trial justice is entitled to great weight and will not be disturbed on appeal unless it is clearly wrong or the trial justice misconceived or overlooked material evidence." *In re Amber P.*, 877 A.2d 608, 617 (R.I.2005) (quoting *In re Jennifer R.*, 667 A.2d 535, 536 (R.I.1995)).

## III

### Discussion

### A. Failure to Accept Responsibility

■ We detect neither clear error nor misconception of material evidence in the trial justice's decision to terminate respondent's parental rights. Indeed, the fore-

2. The question posed to Dr. Parsons was as follows:

"As an expert in psychology with the specialty in children and families, if you had a person who you were evaluating who had been convicted of assault with a dangerous weapon on a child of five-weeks-old, who had been sentenced as a result to 20 years at the Adult Correctional Institut[ions], served 10 years of that sentence, was indicated by the Department of Children, Youth and Families for abuse against that said child, had a second indicated case by DCYF for an abuse, including spiral fractures to the legs of another young child, however, did seek counseling with a pastor while

incarcerated at the Adult Correctional Institution[s], was released from the Adult Correctional Institution[s], proceeded to marry, had a young child with this woman yet continued to be in an abusive relationship in that marriage resulting in this Family Court issuing a restraining order between he and his wife, but he reports he's now been saved by Christ and has been for the past three years, yet, he was only framed for the criminal conviction, would that hypothetical, Dr. Parsons, would you have a clinical opinion to a reasonable degree of psychological certainty as to whether or not that particular client of yours would pose any risk to a five-month-old child?"

most allegation of error that respondent pressed on appeal is undercut by the very case he cites to bolster his argument. The respondent correctly cites *In re Kelly S.*, 715 A.2d 1283, 1287 (R.I.1998), for the proposition that "past actions alone are not sufficient to brand a parent unfit for life." However, much like respondent, the mother seeking custody of her youngest child in *Kelly S.* never accepted responsibility or showed remorse for her previous abusive behavior toward her other children. *Id.* at 1288. This Court emphasized that her "continued failure to accept responsibility for her prior conduct" was a "vital impediment" *id.*, to her efforts to regain custody of her daughter, and agreed with the trial justice's conclusion in that case that "as long as [mother] does not recognize her actions and acknowledge her responsibility for what occurred to her other [children], Kelly would be at serious risk of suffering similar victimization * * *." *Id.* In respondent's case, the trial justice paraphrased this very language in laying out the reasons for her decision to terminate his parental rights. The evidence adduced at trial supports the trial justice's findings that respondent has failed to take any responsibility whatsoever for the horrific abuse inflicted upon his son, but rather has remained steadfast in his denial of ever abusing his son or any other child. This Court's precedent abundantly supports the trial justice's determination that the combination of his past conduct, his unwillingness or inability to acknowledge his responsibility, and his failure to address his issues of anger in any meaningful way was sufficient to warrant the termination of his parental rights. *Id.; see also In re Jared S.*, 787 A.2d 1225, 1227 (R.I.2002).

### B. The Shifting Burden

■ The respondent also contends that the trial justice erred as a matter of law when, in denying his motion for a directed verdict at the close of DCYF's evidence, she allocated to him the burden of proving that he was a fit parent. "Assuming without deciding that a motion for directed verdict is appropriate in a nonjury case (as opposed to a motion to dismiss)," *In re Diana P.*, 656 A.2d 620, 623 (R.I.1995), we believe that respondent has misconstrued the trial justice's assessment that at the time of his motion, DCYF had presented evidence "sufficient to require [him] to present a case." The trial justice was merely placing the burden of going forward on respondent, which is where it properly belonged once she had determined that DCYF had made out a *prima facie* case of cruel or abusive conduct toward any child. *See In re Jarvis R.*, 766 A.2d 395, 399 (R.I.2001). In *Jarvis R.*, a mother appealing a termination order contended that the trial court had erred in assigning to her the burden of proving her mental impairment. *Id.* at 398. This Court's explanation of burden shifting in that context is instructive here as well:

> "The trial justice simply referred to the burden of going forward with this evidence. This is quite different from shifting the burden of proof. To raise an issue, a party must establish sufficient evidence to create the issue for the Court to consider. Although the burden of proof never shifts from the state, 'the burden of going forward with the evidence may indeed shift from side to side, and this same burden may properly devolve upon a defendant once the state has developed a prima facie case and has adduced evidence sufficient to make it just that the defendant be required to challenge the proof with excuse or explanation.'" *Id.* at 399 (quoting *State v. Neary*, 122 R.I. 506, 511–12, 409 A.2d 551, 555 (1979)).

We are satisfied that DCYF had made out a *prima facie* case under § 15–7–7(a)(2)(ii),

and we find no error in the trial justice's shifting to respondent the burden of presenting his own evidence concerning his parental fitness.[3]

## C. The Hypothetical Question

■ Next, respondent alleges that the trial justice abused her discretion by allowing into evidence Dr. Parson's response, as an expert witness, to a hypothetical question that respondent claims did not include "all pertinent and undisputed facts." This Court previously has said, however, that "there is no requirement that a propounder of a hypothetical question include the entire body of testimony put forward by him or his opponent before the question can be admitted." *State v. Capalbo*, 433 A.2d 242, 248 (R.I.1981). In addition, a review of the trial record indicates that the omitted fact of which respondent complains on appeal—his attendance of anger management classes—was not yet in evidence at the time the trial justice ruled on the hypothetical question posed to Dr. Parsons in January 2005. Moreover, in March 2005, when respondent actually did testify about those classes, he said only that he had "signed up" for his anger management class in January 2005. Consequently, it is clear that when DCYF asked Dr. Parsons its hypothetical question, the scenario set forth in it encompassed all relevant facts in evidence at that time. Further, respondent's attorney was free to confront Dr. Parsons with any additional facts on cross-examination, or recall him later, but chose to do neither. Even so, the trial justice clearly considered whether Dr. Parsons's answer to the hypothetical would have changed had he been aware of the classes respondent was attending. And contrary to respondent's contention on appeal, the trial justice's skepticism concerning Dr. Du Pont's opinion had more to do with its inherent flaws than any doubts cast upon it by Dr. Parsons's response to the supposititious question. We discern no abuse of discretion by the trial justice concerning the hypothetical question.

## D. Admission of Dr. Parsons's Report

■ Finally, we find no merit in respondent's objection to the trial justice's decision to admit Dr. Parsons's report into evidence as a full exhibit. Although respondent concedes that Rule 703 of the Rhode Island Rules of Evidence provides for the admissibility of the underlying facts or data that Dr. Parsons, as an expert, relied upon in forming his opinion, he argues that the rule does not allow the expert's actual report into evidence. In

---

**3.** We note, however, that the trial justice misspoke in ruling on respondent's motion when she declared that respondent would have to "establish by clear and convincing evidence * * * that this Court has no further reason to worry about his ability to care for children." When viewed in the larger context of the trial justice's overall analysis, it is clear that her mistake was semantic rather than substantive. The record clearly demonstrates that the trial justice properly denied respondent's "motion for directed verdict" based on her judgment that DCYF had presented ample evidence to make out a *prima facie* case under G.L.1956 § 15-7-7(a)(2)(ii). And in delivering her ultimate decision, the trial justice clarified the critical elements of her analysis:

"Has there been any evidence, this Judge has to ask, submitted by the Respondent * * * to suggest that he is * * * now a fit parent * * *, but more significantly has the Department of Children, Youth and Families established by clear and convincing evidence that [respondent] is unfit, and that it is in the best interest of the child, Corryn, that his parental rights be terminated?"

Although once DCYF has made out a *prima facie* case, it becomes incumbent upon a parent to present evidence tending to show that his or her past abusive conduct no longer endangers the safety of a child, the burden at all times remains on DCYF to prove the parent unfit by clear and convincing evidence.

admitting the report into evidence over respondent's hearsay objection, the trial justice commented, "The weight I give it remains to be seen. I'm certainly capable of reviewing all of your concerns * * *."

Doctor Parsons's report consisted primarily of his own evaluation of Corryn's mother, but also contained some statements about respondent based upon Dr. Du Pont's evaluation and information provided by Corryn's mother. We first note that Dr. Du Pont's report was also admitted into evidence; thus Dr. Parsons's references to it presented neither new nor improper evidence. Doctor Du Pont's report, along with DCYF"s records and his own interviews with Corryn's mother merely comprised the "underlying facts or data" upon which Dr. Parsons relied in forming his opinion. *See* R.I. R. Evid. 703. We also have recognized that trial justices presiding over non-jury trials without a jury possess the wisdom, training and experience necessary to sort through such exhibits and consider only the aspects that are "reliable and probative of the issues relating to the [parent's] conduct." *In re Stephanie,* 660 A.2d 260, 261 (R.I.1995). We are well satisfied that the admission of Dr. Parsons's report as a full exhibit was a sustainable exercise of the trial justice's discretion.

## IV

### Conclusion

After reviewing the record in this case, we are convinced that the trial justice did not overlook or misconceive material evidence and was not otherwise clearly wrong in determining that the respondent was unfit to parent Corryn and that it was in the best interest of Corryn that her father's parental rights be terminated.

Accordingly, we affirm the decree of the Family Court. The papers in this case may be remanded to the Family Court.