### In re PETER S. et al.

### No. 2008–32–Appeal.

Supreme Court of Rhode Island.

June 19, 2009.

---

Laurel C. Ferrelli, Esq., Court Appointed Special Advocate.

Karen A. Clark, Esq., Providence, Department of Children, Youth & Families.

Stefanie Dimaio–Larivee, Esq., for Respondent Father.

Present: GOLDBERG, Acting C.J., FLAHERTY, SUTTELL, ROBINSON, JJ., and WILLIAMS, C.J. (ret.).

## OPINION

Justice ROBINSON for the Court.

The respondent father, Peter S., appeals from a Family Court decree terminating his parental rights with respect to his three children, Peter William S. (born October 4, 2002), Michele S. (born December 31, 2003), and Joshua S. (born September 20, 2005).

This case came before the Supreme Court on March 9, 2009, pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided. After considering the record, the memoranda submitted by the parties, and the oral arguments of counsel, we are of the opinion that cause has not been shown and that the case should be decided at this time.

For the reasons set forth below, we affirm the decree of the Family Court.

## I

### Facts and Travel

The plight of Joshua, respondent's youngest child, first came to the attention of the Department of Children, Youth and Families ("DCYF") on January 1, 2006. On that date, Joshua, who was then just over three months old, was taken to the Hasbro Children's Hospital for emergency medical attention. Immediately after his admission to the hospital for seizures and lifelessness, the DCYF Child Abuse Hotline received a call from a doctor at the Hasbro Child Safe Clinic regarding these critical injuries.

In May of 2006, DCYF petitioned for involuntary termination of respondent's parental rights with respect to the three children who are the subject of the instant appeal; those petitions alleged that the father was "unfit by reason of conduct or conditions seriously detrimental to the child, in that the father has committed conduct toward any child of a cruel or abusive nature." The termination of parental rights trial commenced in the Family Court on May 3, 2007.

At trial, the state was permitted to amend the three above-referenced petitions to add an allegation that the father was "unfit by reason of conduct or condition seriously detrimental to the children, namely imprisonment of such a duration as to render it improbable for [the] father to care for the children for an extended period of time." Next, the state introduced into evidence a certified copy of the father's judgment of criminal conviction and commitment. (The father had pled *nolo contendere* to and had been convicted of felony assault for the injuries inflicted upon his infant son, Joshua. As a result of that conviction, he was sentenced to twenty years, with nine years to serve and eleven years suspended, with probation; he was further ordered to have no contact with the victim.)

Dante D'Alessio, a DCYF child protective investigator, was a witness at respondent's termination proceeding. He testified that he was assigned to Joshua's case on January 1, 2006 as a result of a report from Shelly Martin, M.D., of Hasbro Children's Hospital's Child Safe Clinic that Joshua had suffered a serious head injury. He testified that the DCYF hotline was contacted at 10:43 a.m. on that date and was informed that Joshua was lifeless and was experiencing a seizure. Joshua had been taken from his home in West Green-

wich to Kent County Hospital and then to Hasbro Children's Hospital. Mr. D'Alessio further testified that he initially contacted Dr. Martin by phone and was told that the results of a seizure scan were within a normal range and that the child had no external injuries.

Mr. D'Alessio testified that he interviewed both parents at Hasbro Children's Hospital on January 1, 2006. He related the sequence of events surrounding Joshua's emergency as told to him by respondent. He testified that respondent stated that, after Joshua had woken up at approximately 6:45 a.m., he went to check on the child and then left the child's room to prepare a bottle. The father told Mr. D'Alessio that, when he returned, he noticed that Joshua was limp, lifeless, and was having trouble breathing and that he attempted to stimulate breathing by rubbing the child's back, but then decided to call 9–1–1. The respondent further told Mr. D'Alessio that he was not aware of any trauma suffered by the child, aside from an incident that had occurred several weeks before, when Joshua was struck by a plastic toy thrown by another child.

Mr. D'Alessio further testified that the next day the doctor told him that, although not all the tests had been completed, it nonetheless appeared that Joshua's head trauma had been inflicted upon him by a third party. Mr. D'Alessio testified that he then called the West Greenwich police and reported this information. He stated that he interviewed the parents again on January 3, 2006 and that the father continued to deny any knowledge as to how Joshua had been injured. The respondent told Mr. D'Alessio that Joshua had awakened crying in the morning, but he insisted that he did not become frustrated with the

child and did not hurt him. He stated that he called 9–1–1 after speaking to his wife and that he told emergency personnel that Joshua was having a seizure and that he had a history of seizures.

Mr. D'Alessio testified that, on January 3, 2006, upon responding to a phone message from Joshua's mother, Nicole,[1] he spoke with her and she told him that she had spoken to respondent, who told her that he had shaken the baby. Mr. D'Alessio testified, that when he spoke with Nicole, she was on her way to the West Greenwich Police Department to give a statement regarding what respondent had recently admitted to her. He further testified that he and another investigator went to the police department and that he was present at the police station during most of the interview that the police conducted with Nicole. Mr. D'Alessio stated that he was also present when Nicole spoke with respondent by phone from the police station. He stated that, while listening to their conversation on the speaker phone, he heard respondent confess to having shaken the baby three or four times due to the fact that Joshua would not stop crying.

Christine Barron, M.D., the clinical director of the Hasbro Children's Hospital's Child Protection Program, also testified at respondent's trial. She was qualified as an expert in the field of pediatric emergency medicine. Doctor Barron testified that she became aware of Joshua on January 1, 2006, when he was admitted to the Hasbro Children's Hospital pediatric intensive care unit. She further testified that Joshua had first been transported from home by emergency medical services to Kent County Hospital, where he was stabilized,

1. Nicole is also the mother of the other two children, Peter and Michele, who are also the subject of the instant appeal.

and was then transported to the pediatric intensive care unit at Hasbro.

Doctor Barron testified that, in addition to undergoing physical examinations, Joshua underwent a computed tomography scan of his brain, an MRI of his brain, an MRI of his entire body, a dilated ophthalmologic examination, and a battery of other tests at Hasbro. She testified that Joshua was diagnosed with acute and chronic subdural hematomas ("collections of blood * * * just above the brain tissue and below the dura") and subarachnoid hematomas ("blood * * * at the surface of the brain"). Doctor Barron further testified that Joshua was also diagnosed with "bilateral ischemic brain injury," which she said meant that the "tissue of his brain was injured" and that he had bilateral retinal hemorrhages and a skull fracture. She testified that, in her opinion, Joshua had suffered abusive head trauma due to shaking or shaking impact (*i.e.*, the so-called "shaken baby syndrome").

Doctor Barron testified as to the treatment that Joshua underwent at the hospital. She testified that he initially required intubation and emergency surgery to have the blood on the surface of his brain removed. He remained in the intensive care unit and required medications for seizures as a result of his brain injury. Doctor Barron further testified that Joshua remained in the hospital until he was transferred to Tavares Pediatric Center.

Doctor Barron testified in detail as to how a child of Joshua's age could have sustained such serious head trauma culminating in this type of injury (*viz.*, the subdural hematomas).[2] She also testified that Joshua's examination revealed that there had been a previous injury to his brain in addition to the injury for which he

was hospitalized in January of 2006. She opined that the older injury was not as severe as the injury that led to his admission to Hasbro and that the two occurrences took place between seven and thirty days of each other.

She further testified that these types of injuries are irreparable and that Joshua was not expected to develop according to normal developmental milestones. Specifically, Dr. Barron testified that he would not be able to attend school at five years of age, jump, play, or "[b]e a normal, active child."

The respondent presented three witnesses in support of his case. Nicole, his former wife, testified that she and respondent lived in an in-law apartment at his parents' home during their marriage. She stated that she worked during the day while her husband cared for the children. She indicated that her husband threatened suicide after Joshua's injury and that she called the police out of fear that he would carry out that threat. She further testified that she and respondent are now divorced and that she has sole custody of the children, with respondent having no visitation rights.

The respondent's mother testified on his behalf. She testified that she had observed her son interacting with his two older children, Peter and Michele, and she said that she believed that he had a good relationship with them. She testified that she has spoken to her son about what happened to Joshua and that she believes he is remorseful.

The respondent's father also testified. He testified that his son was a very loving, caring father.

---

**2.** Although the record contains extensive testimony as to how such injuries occur and as to their physical effects on the brain, no purpose would be served by detailing that sometimes gruesome testimony.

On July 19, 2007, the trial justice rendered a bench decision wherein he terminated respondent's parental rights pursuant to G.L. 1956 § 15–7–7(a)(2)(ii). That statute provides for the termination of parental rights for conduct towards any child of a cruel or abusive nature.[3]

After reviewing the evidence, the trial justice stated that he had no doubt that Joshua's injuries were inflicted by his father. The trial justice also, upon reviewing the evidence, found that respondent was an unfit parent with respect to Joshua "by reason of conduct or conditions so detrimental to this child that this father has in fact by his actions and his conduct inflicted these injuries on Joshua of a cruel and abusive nature."

In determining whether or not to terminate respondent's parental rights to his other children (*viz.*, Peter and Michele) the trial justice stated that respondent's actions towards Joshua "were such that the very fabric of this family was torn." He recognized that both Peter and Michele would never be able to interact with Joshua the way brothers and sisters ordinarily do. Specifically, he noted that, "Peter * * * will never be able to have his brother play with him in a normal, healthy, fraternal manner where they can toss a football or play baseball or go to the boy scouts together * * *." In like manner, the trial justice noted that Michele "won't have the advantage of having her little brother around her because her little brother * * * is in Tavares Pediatric Center for who knows how long and who will have significant developmental delays for the rest of his life * * *." The trial justice concluded that respondent's conduct toward one child (Joshua) was a factor to be considered when determining the parent's fitness as to his other children (Peter and Michele), and he found that respondent was unfit to parent Peter and Michele.

A termination of parental rights decree was entered on August 2, 2007. In said decree, the trial justice set forth his findings of fact, found respondent to be an unfit parent as to all three children, and then terminated respondent's parental rights. The respondent filed a timely notice of appeal.

On appeal, respondent argues that the trial justice erred in terminating his parental rights because the decree was based upon one isolated incident of abusive behavior. The respondent also contends that, because he is divorced from Nicole and no longer has custody of his children, there was no need to terminate his parental rights. The respondent further contends that parental rights may not be terminated based upon his incarceration alone and that there was no evidence indicating that he is a danger to his children. The respondent also contends that DCYF should have offered him services and made reasonable efforts to reunite him with his children. He further submits that he has accepted responsibility for Joshua's injuries; and, on that basis, he argues that his parental rights should not have been terminated.

---

3. General Laws 1956 § 15–7–7(a) states in pertinent part as follows:
 "The court shall, upon a petition duly filed by a governmental child placement agency * * * after notice to the parent and a hearing on the petition, terminate any and all legal rights of the parent to the child * * * if the court finds as a fact by clear and convincing evidence that:

"* * *

"(2) The parent is unfit by reason of conduct or conditions seriously detrimental to the child; such as, but not limited to, the following:

"* * *

"(ii) Conduct toward any child of a cruel or abusive nature."

## II

### Standard of Review

 In reviewing a Family Court termination decree pursuant to § 15-7-7(a), this Court employs a deferential standard of review. *In re Brooklyn M.*, 933 A.2d 1113, 1121 (R.I.2007). The Court accords great weight to a Family Court finding of parental unfitness and will not disturb that finding unless "it is clearly erroneous or the trial justice overlooked material evidence." *Id.*; *see also In re Kayla N.*, 900 A.2d 1202, 1208 (R.I.2006); *In re Amber P.*, 877 A.2d 608, 617 (R.I.2005). In conducting its review, this Court examines the record to determine if legally competent evidence exists to support the trial justice's findings. *In re Brooklyn M.*, 933 A.2d at 1121; *see also In re Kayla N.*, 900 A.2d at 1208; *In re Corryn B.*, 914 A.2d 978, 981 (R.I.2007).

## III

### Analysis

 We engage in a three-step process when we review a Family Court's decision to terminate parental rights. First, we turn to the court's finding of parental unfitness. Next, we examine the court's findings as to the reasonable reunification efforts on the part of DCYF. Finally, we scrutinize the Family Court's determination concerning the best interests of the child or children. *See In re Brooklyn M.*, 933 A.2d at 1122.

### A

### Parental Unfitness

 The respondent first contends on appeal that the trial justice erred in terminating his parental rights based upon one isolated incident of abusive behavior.[4] He claims that he has shown remorse for the incident and that he should not be "brand[ed] unfit for life." In support of his argument, respondent cites the cases of *In re Kelly.*, 715 A.2d 1283 (R.I.1998), and *In re Corryn B.*, even though the decisions in those cases upheld the termination of parental rights. The respondent argues that, in the just-mentioned cases, the parents failed to show remorse or accept responsibility for their past actions—whereas, in contrast, he has entered a plea of *nolo contendere* to criminal charges and expressed sorrow for his crime.

The factual circumstances of *In re Kelly S.* and *In re Corryn B.* differ from the facts presented by the instant case. In those cases, termination petitions were brought against parents who had been guilty of abusing a child in the past, but had failed to acknowledge their guilt or express regret for their actions. *In re Corryn B.*, 914 A.2d at 979; *In re Kelly S.*, 715 A.2d at 1287. Years later, when they became parents once again, DCYF successfully sought to terminate their parental rights based upon the earlier incidents of abuse. *In re Corryn B.*, 914 A.2d at 979; *In re Kelly S.*, 715 A.2d at 1286. In the present case, however, respondent's abusive behavior did not occur in the distant past, but rather was the actual basis for the present termination petition.

The instant case is analogous to *In re Frances,* 505 A.2d 1380 (R.I.1986) and *In re Destiny D.*, 922 A.2d 168 (R.I.2007). In the case of *In re Frances,* the respondent mother had five children—one of whom, an eleven-month-old child, suffered severe and permanent injuries as a result of abuse by her. *In re Frances,* 505 A.2d at

---

4. It will be recalled that Dr. Barron testified that test results showed that Joshua had suf-fered two separate incidents of trauma.

1381–82. This Court upheld the termination of the mother's parental rights with respect to all of her children based upon her conduct of a cruel or abusive nature with respect to *any* child;[5] we reasoned that "[t]he state, under the scrutiny of the court, need not wait until a child's life has been permanently and irretrievable impaired before acting." *Id.* at 1385 (internal quotation marks omitted); *see also In re Lester,* 417 A.2d 877, 881 (R.I.1980).

In the case of *In re Destiny D.,* 922 A.2d at 171, the parents brutally beat their three-year-old nephew to death, prompting DCYF to file termination petitions as to the couple's own children. The Court upheld the termination of their parental rights and forthrightly stated: "There is no requirement that a court wait until a child is actually harmed before such court provides the protection of the state." *Id.* at 175 (internal quotation marks omitted); *see also In re Luz J.,* 447 A.2d 1148, 1152 (R.I.1982).

■ Once a trial justice has found *prima facie* evidence of cruel or abusive conduct on the part of a parent toward one child, the burden of producing evidence of parental fitness shifts to the parent. *In re Victoria L.,* 950 A.2d 1168, 1175 (R.I.2008); *see also In re Corryn B.,* 914 A.2d at 982–83. At this stage of the proceeding, "the parent must present evidence demonstrating that his or her past abusive conduct no longer endangers the safety of a child." *In re Victoria L.,* 950 A.2d at 1175 (internal quotation marks omitted); *see also In re Corryn B.,* 914 A.2d at 983 n. 3. Although a parent must produce evidence that his or her past abusive conduct no longer endangers the safety of a child, at all times DCYF must bear the burden of proving by clear and convincing evidence

that the parent is unfit. *In re Victoria L.,* 950 A.2d at 1175; *see also In re Corryn B.,* 914 A.2d at 983 n. 3.

The injuries suffered by Joshua were the result of a violent, intentional act on the part of respondent. Although respondent may now regret his actions, such regret falls lamentably short of constituting a credible assurance that his other children will not suffer a similar fate. Accordingly, we hold that the trial justice's finding of unfitness is supported by the evidence.

■ The respondent father next contends that, because at the time of the Family Court proceedings, he was divorced from Nicole and no longer had custody of his children, there was no need to terminate his parental rights. He asserts that the protection afforded by the divorce decree is sufficient to ensure that he will not have custody or see his children until he is determined to be a fit parent by the court. The respondent cites to no statutory or decisional authority in support of this proposition.

Nicole testified that, as part of the divorce agreement, she was to have sole custody of the children and respondent would not be allowed visitation with the children until further order of the court. It is true, that in both divorce and termination of parental rights proceedings, the court considers the "best interests of the child." *See, e.g., In re Alvia K.,* 909 A.2d 498, 505 (R.I.2006) (discussing the analysis to be undertaken and the factors to be considered when determining the "best interests" of the child following an establishment of parental unfitness in a termination of parental rights proceeding); *Pettinato v. Pettinato,* 582 A.2d 909, 913–14 (R.I.

---

**5.** It should be recalled that § 15–7–7(a)(2)(ii) mandates the termination of parental rights upon a finding that the parent has engaged in "[c]onduct toward any child of a cruel or abusive nature."

1990) (setting forth the critical "best interests of the child" factors the court must consider when deciding issues of child custody, placement, and relocation). However, it is also plainly obvious that a divorce decree is not a substitute for the protection afforded to children by the state through the termination of parental rights procedure. A divorce proceeding is wholly distinct and separate from a termination of parental rights proceeding. We are aware of no decision by this or any other American appellate court holding that the terms of a divorce decree can be as effective in protecting children as the state's termination of parental rights. Accordingly, we find no merit in respondent's argument in this regard.

The next issue raised by respondent concerns his incarceration. The respondent acknowledges that the trial justice did not rely upon this factor in his decision, but he nonetheless contends that parental rights may not be terminated based upon incarceration alone.[6] The respondent's judgment of criminal conviction and commitment was entered into evidence as an exhibit. However, aside from acknowledging the fact of that conviction in his bench decision and in his subsequent written decree, there is nothing in the record to indicate that the trial justice relied upon respondent's incarceration as a determinative factor in terminating his parental rights. Even if he had done so, however, it is well settled that incarceration may be considered as one factor among others in deciding whether to terminate a parent's rights. *See In re Isabella C.*, 852 A.2d 550, 558 (R.I.2004) ("We are mindful that parental rights should not be terminated solely because of conviction of a crime and

a parent's subsequent incarceration; however, a parent's imprisonment may be considered along with other factors in deciding whether to terminate parental rights."); *In re Frances*, 505 A.2d at 1385 ("Although parental rights should not be terminated for the sole reason of conviction of a crime and incarceration, the fact of incarceration may be considered along with other factors in determining whether parental rights should be terminated.").

In summary, we are satisfied that the trial justice did not err in finding, by clear and convincing evidence, that respondent was an unfit parent.

**B**

**Reasonable Efforts**

■ The respondent next argues that DCYF should have offered him services and made reasonable efforts to reunite him with his children. In our judgment respondent's argument is without basis in the law and is unavailing. Because respondent's rights were terminated pursuant to § 15–7–7(a)(2)(ii), DCYF was under no obligation to attempt reunification.

Pursuant to the explicit language of § 15–7–7(b)(1), "[i]n the event that a petition is filed pursuant to subdivision[ ] * * * (a)(2)(ii) of this section, the department has no obligation to engage in reasonable efforts to preserve and reunify a family." The instant case falls squarely within that statutory directive. *See In re Natalya C.*, 946 A.2d 198, 203 n. 10 (R.I. 2008) ("It should be noted that this [the statutory requirement that reasonable efforts to encourage and strengthen the parental relationship be made prior to filing a termination of parental rights petition]

---

6. It will be recalled that the trial justice allowed DCYF to amend the termination petition on the first day of trial to include an allegation that respondent's incarceration

would be of such duration as to render it improbable for him to care for his children for an extended period. *See* § 15–7–7(a)(2)(i).

does not apply to abuse petitions filed under § 15–7–7(a)(2)(ii).”); *In re Nicole B.,* 703 A.2d 612, 617 (R.I.1997) (holding that, when the evidence is sufficient to establish parental conduct of a cruel or abusive nature, it is unnecessary for DCYF to make reasonable efforts to reunite parents with children before seeking termination of parental rights).

Accordingly, respondent's argument that he "should have been offered some kind of services to assist him in rehabilitation and to encourage and strengthen the parental bonds" is utterly lacking in merit.

## C

### The Best Interests of the Children

■ The respondent further argues that there was no evidence indicating that he is a danger to his children. He contends that, because he has shown remorse and accepted responsibility for Joshua's injuries, his parental rights should not be terminated. These arguments are unavailing. Once respondent was found to be an unfit parent, the best interests of his children quite rightly became the paramount concern of the Family Court. *See In re Brooklyn M.,* 933 A.2d at 1126 ("Once DCYF has demonstrated parental unfitness * * * the Family Court then shifts its analysis to consider the best interests of the child or children involved in the pro-

ceeding. * * * At that juncture, the best interests of the child or children outweigh all other considerations."). In assessing the children's best interests, a court considers the child's right to reasonable care and maintenance, freedom from abuse or neglect, and the opportunity to grow up in a family setting in which the child may thrive. *See In re Alvia K.,* 909 A.2d at 505; *In re Mariah M.,* 899 A.2d 423, 427 (R.I.2006).

The trial justice found that it was in the best interests of the three children to terminate the respondent's parental rights. After carefully reviewing the record in this case, we perceive no error in the trial justice's "best interests" determination.

### Conclusion

After reviewing the record in this case, we are convinced that the Family Court acted correctly in deciding to terminate the parental rights of the respondent with respect to Joshua S., Michele S., and Peter S., and we affirm that decree. The record may be returned to the Family Court.