**In re MARIAH M.**

No. 2004–193–Appeal.

Supreme Court of Rhode Island.

March 14, 2006.

**424**

Catherine Gibran, Providence, for Petitioner.

Karen Clark, Providence, for DCYF.

Richard K. Foster, Lincoln, for Guardian Ad Litem.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

**OPINION**

Chief Justice WILLIAMS, for the Court.

The respondent, Tarrah M.[1] (respondent), appeals a judgment of the Family Court terminating her parental rights as to her daughter, Mariah. This case came before the Supreme Court for oral argument on January 25, 2006, pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not summarily be decided. After hearing the arguments and examining the record and the memoranda that the parties filed, we are of the opinion that this appeal may be decided at this time, without further briefing or argument. For the reasons hereinafter set forth, we affirm the judgment of the Family Court.

**I**

**Facts and Travel**

The respondent was herself a foster child when she gave birth to Mariah, beginning Mariah's lifelong involvement with the Department of Children, Youth and Families (DCYF). Mariah's first home was a special mentoring foster home in Woonsocket, where both she and respondent lived under the care of the state. The respondent had just turned seventeen when Mariah was born on July 13, 1999. After respondent had a falling out with her foster parents, she and Mariah were placed in another mentoring foster home so that they could stay together. When respondent left that home to move in with Mariah's father, Yusef Berryman,[2] Mariah was placed in a non-relative foster home. With the exception of five and a half months spent living with her mother, Mariah has lived in the same foster home since June 2000, which her caseworker calls a "safe, stable" environment where Mariah has been "well taken care of."

---

1. Tarrah M. is referred to as either "Tarah" or "Tara" or "Tarrah" throughout the record. We refer to her solely as Tarrah, the name on Mariah's birth certificate and the spelling respondent used in signed court documents.

2. Yusef Berryman's parental rights were terminated at the same hearing as respondent's. He does not participate in this appeal.

Mariah's foster parents would like to adopt her.

DCYF filed a petition to terminate the parental rights of both Mariah's birth parents. With respect to respondent, DCYF sought a termination of parental rights pursuant to G.L.1956 § 15–7–7(a)(3), on the grounds that Mariah had been in the care of DCYF for at least twelve months and respondent was "offered or received services to correct the situation which led to the child being placed," and that "there is not a substantial probability that the child will be able to return safely to [respondent's] care within a reasonable period of time considering the child's age and the need for a permanent home."

A termination hearing was held in Family Court on March 27 and April 2, 2003. Steven Kapalka (Kapalka or caseworker), the caseworker assigned to Mariah since 2000, testified for DCYF. Kapalka was the third social worker assigned to Mariah's case. A total of nine case plans were prepared, seven of which were aimed at reuniting respondent and Mariah, and two of which were aimed at maintaining Mariah in respondent's home. Kapalka testified that two separate parent aide services were set up for respondent and then terminated based on respondent's failure to maintain contact with the parent aide. The respondent "had a short temper" and "didn't want to listen to some of the advice" provided to her by the parenting aide.

By August 2001, respondent had obtained housing with the assistance of DCYF. DCYF attempted reunification by placing Mariah with her mother in that residence. DCYF gave respondent documents to obtain medical insurance for Mariah; however, respondent never obtained that insurance. The respondent's home situation deteriorated, despite the assistance of parent aide services to help respondent parent Mariah. Other people moved into the home without the required prior approval of DCYF. In December 2001, DCYF received two telephone calls on the same day regarding Mariah's placement with her mother. A family member called to express concern for Mariah's safety and welfare, and respondent herself called DCYF to admit that she was "a little frantic about being overwhelmed." DCYF immediately scheduled a home visit, during which the distraught respondent said that she could not handle caring for Mariah at that time in her life, that while working as an exotic dancer she had begun abusing substances obtained from other dancers at her workplace, that she was getting evicted from her apartment, and that she had lied during an earlier mental health evaluation and actually felt she was in need of mental health assistance. As a result of this home visit, Mariah was removed from respondent's residence by DCYF and placed again with the same foster family who had cared for her since 2000.

The caseworker testified that after Mariah was removed from respondent's care in December 2001, DCYF continued to take steps toward reunification. They concentrated their efforts on providing assistance for respondent's mental health issues and the substance abuse to which she had admitted. In addition, DCYF addressed respondent's housing issue by sending her a Section 8 housing voucher; she failed to follow through, however, despite Kapalka's personally escorting respondent to a class demonstrating each step involved in the Section 8 process.

The respondent was transient during the next few months and difficult to contact. In approximately March 2002, respondent moved in with her grandmother. DCYF set up substance abuse counseling and mental health services. While living with

her grandmother, respondent attended all appointments. DCYF subsequently set up another reunification, and Mariah was placed with respondent in the grandmother's house in August 2002. A week after reunification, however, the grandmother called DCYF to report that respondent and Mariah had left her home after an argument, and the grandmother was concerned for the welfare of her now homeless granddaughter and Mariah. DCYF settled respondent and her daughter in a Providence shelter, where they remained for approximately one month. After leaving her grandmother's home, respondent's cooperation with DCYF's services plummeted. DCYF encouraged respondent to continue attending mental health and substance abuse counseling, but she refused. The shelter expressed concern for respondent's mental health, as did respondent herself. The caseworker scheduled a psychiatric evaluation, but due to respondent's constant missed appointments, the counseling center cut off her services. Mariah was subsequently removed from respondent's care and again returned to her foster parents.

Of the nine case plans DCYF prepared with respondent, respondent was able to achieve case plan goals on only two occasions, at which time DCYF then attempted reunification on each occasion.[3] However, after each reunification, respondent's "situation deteriorated quickly," prompting DCYF to remove Mariah from respondent's care.

The respondent testified on her own behalf at the hearing. She said that she was currently living in a two-bedroom apartment in Cranston, attending a substance abuse counseling program, and maintaining sobriety. She discussed the extensive

planning done with her by DCYF, and praised the caseworker for his skill in listening to her and providing support. She described herself as currently willing and able to care for Mariah, and testified to the mutual love between mother and child.

The trial justice issued a bench decision, finding that DCYF had prepared nine case plans for respondent, none of which had come to full fruition; that there was no substantial probability that Mariah could safely return to her mother's care within a reasonable amount of time, taking into account Mariah's age and her need for a permanent home; and, following his determination of parental unfitness, that it was in Mariah's best interests to be freed for adoption by her foster parents. A subsequent Family Court decree terminated respondent's parental rights. The respondent then filed a notice of appeal.

## II

## Analysis

On appeal, respondent argues that the trial justice erred when he found, by clear and convincing evidence, that DCYF had met its burden of proof with respect to the specific requirement of § 15–7–7(a)(3) that there was not a substantial probability that Mariah would be able to return safely to respondent's care within a reasonable period of time, taking into account Mariah's age and her need for a permanent home. The respondent also contends that the trial justice erred when he found respondent to be unfit because respondent was not unfit at the time of trial. Finally, the respondent appeals the trial justice's finding in his bench decision that respondent "failed to comply with *any* of the objectives in her caseplans." (Emphasis added.)

---

3. We commend Steven Kapalka for the extensive efforts he made to reunite respondent with Mariah.

## 1

## Standard of Review

 This Court reviews termination of parental rights rulings by "examining the record to establish whether the hearing justice's findings are supported by legally competent evidence." *In re Shawn B.*, 864 A.2d 621, 623 (R.I.2005). The standard is deferential: "The trial justice's findings 'are entitled to great weight, and this Court will not disturb them on appeal unless the findings are clearly wrong or the trial justice misconceived or overlooked material evidence.' " *Id.* (quoting *In re Abby D.*, 839 A.2d 1222, 1225 (R.I. 2004)).

## 2

## Timing and the Finding of Unfitness

 Section 15–7–7(a)(3) states that parental rights may be terminated upon a finding by clear and convincing evidence that:

> "The child has been placed in the legal custody or care of the department for children, youth, and families for at least twelve (12) months, and the parents were offered or received services to correct the situation which led to the child being placed; provided, that there is not a substantial probability that the child will be able to return safely to the parents' care within a reasonable period of time considering the child's age and the need for a permanent home."

While a biological parent and child share a vital interest in preventing an erroneous termination of their relationship, *In re Kristen B.*, 558 A.2d 200, 203 (R.I.1989), following a determination that a parent is unfit, the best interests of the child outweigh all other considerations, *In re Kristina L.*, 520 A.2d 574, 580 (R.I.1987). An analysis of the best interests of the child encompasses " 'the right of a minor child

to reasonable care and maintenance, freedom from abuse or neglect, and the right to be given an opportunity to spend the remainder of his or her childhood in a family setting in which the child may grow and thrive.' " *In re Robert S.*, 840 A.2d 1146, 1151 (R.I.2004).

The respondent relies heavily on our decision in *In re Ann Marie*, 504 A.2d 464 (R.I.1986), to argue that in order to find a parent unfit for the purposes of termination, said unfitness must exist at the time of the trial. In *In re Ann Marie*, the respondent mother was not permitted to enter evidence, at the termination hearing, of her present situation. *Id.* at 466. The respondent mother in that case was limited to presenting testimony on the facts of her life *as they existed prior to the filing of the termination petition. Id.* The respondent in that case subsequently had her parental rights terminated. *Id.* We stated in that case that, based on our termination of the parental rights statute, "it is clearly evident that the evidentiary scope of the trial court's inquiry in parental termination proceedings * * * is not limited to events occurring prior to the petition's filing." *Id.* We then held that the trial justice's error in that case was harmless, because the barred testimony, if admitted, would not have changed the outcome of the case. *Id.* at 467.

 We disagree with respondent's reading of *In re Ann Marie*. In the present case, respondent was in no way prevented from giving testimony about her present situation. On the contrary, such evidence came in with no objection during respondent's own testimony, *and* during the caseworker's testimony on cross-examination. The respondent's current situation was also mentioned during the closing arguments of both DCYF and respondent. While on the stand, respondent, *inter alia,* described her current living situation as a

two-bedroom apartment in a nice area of Cranston; explained the parameters of the substance abuse program with which she was currently involved; told the court she was currently in counseling; and gave evidence about her recent, consistently negative drug screens. The respondent's reading of *In re Ann Marie* would *require* parental unfitness to exist at the time of the hearing. This reading is overbroad and inaccurate. Our holding in *In re Ann Marie* merely determined that a respondent mother may not be *forbidden* from entering testimony about her present situation. The glut of testimony presented here about respondent's present situation—without objection—removes this case completely from the control of *In re Ann Marie*.

The respondent also argues that under *In re Kelly S.*, 715 A.2d 1283, 1287 (R.I. 1998), "past actions alone are not sufficient to brand a parent unfit for life," and therefore respondent's improved situation should have trumped her "past actions." Again, the facts of that case are easily distinguishable from the case at bar. In *In re Kelly S.*, we declined to adopt the reasoning that once a parent is found unfit with respect to one child, that parent's rights with respect to subsequent children could be terminated with no consideration of changed circumstances: "Thus, although * * * the threshold of evidence with regard to this other child is diminished in the face of such horrific prior actions, past actions alone are not sufficient to brand a parent unfit for life." *Id. In re Kelly S.* does not control in the present case, in which the history of respondent's behavior toward a single child is at issue.

We think that the trial justice did not err when, after taking into account all the evidence presented at the hearing, he found respondent to be unfit despite the recent improvements in her living situation and substance abuse problems. The testimony presented at trial, taken as a whole, portrayed a young woman who, despite what may be excellent intentions, failed time and again to provide a safe, stable home for her daughter. Throughout Mariah's short life, any improvements in respondent's situation were followed by quick declines. Reviewing the trial justice's decision with the deferential standard appropriate in this case, we hold that the trial justice did not err when finding that respondent was unfit.

**3**

**The Requirements of § 15–7–7(a)(3)**

The respondent contends that the trial justice erred when he found that DCYF had proved by clear and convincing evidence the elements of § 15–7–7(a)(3). As stated in the termination decree, the trial justice found that respondent was offered or received services to correct the situation that led to Mariah's placement, and that "there is not a substantial probability that Mariah will be able to return safely to [her mother's] care within a reasonable period of time."

The respondent does not contest the finding that she was offered or received services to correct the situation that led to Mariah's placement. Instead, respondent contests the finding that there is not a substantial probability that Mariah will be able to return to her mother's care within a reasonable period of time. The respondent contends, based upon her current stable living situation, sobriety, and counseling, that she is able at present to care appropriately for her daughter. However, on appeal, DCYF has pointed out that respondent has flirted with sobriety and stability in the past, with little long-term effect. Twice, respondent achieved the objectives set forth in the case plans prepared with her by DCYF. Twice, in re-

sponse to respondent's efforts to correct her situation and provide a fit environment for her child, DCYF reunified Mariah with her mother and provided support to ease the transition. And twice, respondent's situation then deteriorated to the point that Mariah had to be removed from her care and placed again in foster care. The state in this case is twice bitten, thrice shy.

The respondent's current situation, though greatly improved, does not change the uncontested evidence that Mariah was repeatedly returned to respondent, only to be placed back in her foster home when respondent failed to care adequately for her. At the time of trial, respondent testified that she had maintained sobriety for four months. However, in the past, respondent maintained sobriety for seven consecutive months, only to begin using drugs again. The respondent did not offer at the hearing, nor did her counsel at oral argument, that any evidence existed to support the idea that this time, respondent's sobriety and ability to parent Mariah would last.[4] We hold that legally competent evidence existed to support the trial justice's finding, despite the present improvement in respondent's situation, that there was not a substantial probability that Mariah could be safely returned to respondent within a reasonable amount of time.

By the time of trial, Mariah had spent most of the last three years, save less than six months of total time spent with her mother, living with the same pre-adoptive foster family. Section 15–7–7(a)(3) instructs the court to "consider[ ] the child's age and the need for a permanent home" when determining whether a substantial probability of reunification exists. The last two reunifications resulted in imper-

manence. Mariah was not quite four years old at the time of trial, bonded to a stable foster home with foster parents who desired to adopt her. We hold that the trial justice did not err when he found that, taking into account Mariah's age and need for a permanent home, there was no substantial probability that she could return to respondent's safe care within a reasonable amount of time.

4

### Failure to Comply with Case Plan Objectives

▮ The respondent contends that the trial justice erred when, in his bench decision, he found that respondent had failed to comply with any of the objectives of her nine case plans. On appeal, the respondent argues that she did, in fact, comply with two of the case plans, which then resulted in two separate, if brief, reunifications with her daughter. We discussed the case plan objectives and the temporary reunifications more thoroughly above. Two possibilities exist for the trial justice's wording in his bench decision: first, while the respondent did comply with two different case plans, her compliance was only temporary, resulting in the repeated removal of Mariah from her care; second, the trial justice simply misspoke. Regardless of which possibility explains the trial justice's bench finding, the fact remains that the one sentence to which the respondent objects did not affect the decision to terminate the respondent's parental rights. The trial justice elaborated fully in his bench decision the reasons for finding the respondent unfit, the respondent's history with regard to the nine case plans, and

---

4. At oral argument, respondent's counsel could not remember the last time she had spoken with respondent. She stated that respondent had not contacted her to inquire about the case, and acknowledged that respondent's history of transience and difficulty maintaining contact factored largely in each removal of Mariah from her care.

DCYF's reunification attempts. If error at all, that one sentence is harmless.

## III

### Conclusion

While we applaud the respondent's recent efforts to get her life in order, we uphold the trial justice's ruling that Mariah's best interests are met by terminating the respondent's parental rights so that Mariah may be adopted by her foster parents, who we hope will provide enough stability that this multi-generational cycle of foster care may eventually be broken. We note that the trial justice was thorough and fair in his assessment of the totality of the respondent's parenting history, and we agree with the trial justice's ultimate conclusion. For the reasons stated above, we affirm the judgment of the Family Court. The record shall be remanded to the Family Court.