In re BROOKLYN M. et al.

No. 2005–335–Appeal.

Supreme Court of Rhode Island.

Nov. 2, 2007.

Leo F. Manfred II, Westerly, for Petitioner.

Karen M. Clark, for DCYF.

Frank P. Iacono, Jr., for CASA.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice ROBINSON for the Court.

This is an appeal by a mother, Amanda D., from a decree entered in the Family Court terminating her parental rights as to her daughter, Brooklyn M. (born August 4, 1998), and her son, Isaiah D. (born August 17, 1999). For the reasons set forth in this opinion, we uphold the Family Court's decision to terminate parental rights in the instant case.

### FACTS AND TRAVEL

Amanda first became involved with the Department of Children, Youth and Families (DCYF) on December 11, 1995, when she was indicated[1] for verbal abuse against her son, Joshua S.[2] Following her

---

1. Child Protective Investigators "indicate" a case if, upon completion of an investigation, a preponderance of the evidence demonstrates to them that a child has been abused or neglected.

2. Amanda's two older children, Joshua S. and Jeremiah S., are in their father's custody and are not involved in the instant case.

treatment for substance abuse and participation in parent education classes and in the Early Intervention program, Amanda maintained six months of stability, and the case was closed.

DCYF reopened this lamentable case on January 17, 2001. After conducting five investigations concerning alleged excessive/inappropriate discipline and neglect by Amanda and after receiving several hotline telephone calls regarding Brooklyn and Isaiah, DCYF filed "straight" non-detention child neglect petitions with respect to each child on October 4, 2001. In its petitions, DCYF alleged: (1) that the parents of Brooklyn and Isaiah had failed to provide "a minimum degree of care, supervision or guardianship"; (2) that the children were without proper parental care and supervision; (3) that the father had abandoned and/or deserted the children;[3] and (4) that the children were at substantial risk of physical injury or that the mother had in fact inflicted injury, including excessive corporal punishment. DCYF further alleged in its petitions that Amanda had been arrested and arraigned for simple assault and domestic violence and that the children had witnessed the altercation as well as their mother's arrest in connection with same. DCYF also alleged in its petitions that an advocate from the Women's Resource Center had called the DCYF hotline and reported that she had witnessed Amanda slap her son, Jeremiah.

## The Several Case Plans Prepared by DCYF

After filing the neglect petitions in October of 2001, DCYF prepared a series of case plans intended to address its concerns about Amanda's fitness as a parent without removing the children from her home.[4] While the children were in her care, Amanda received public assistance and maintained an apartment in Newport.

The goal of the first case plan, dated October 24, 2001, was for Amanda to work on (1) improving her parenting skills; (2) achieving financial stability; (3) assuring home safety; and (4) providing for the children's housing, clothing, food, educational, and medical needs.[5] Amanda refused to sign that case plan.

In connection with that first case plan, DCYF caseworker John Bernardo, who had been assigned to Amanda's case in February of 2001, testified[6] that DCYF offered to make available the following services to Amanda: (1) parenting classes

---

**3.** In December of 2000, the father of Brooklyn and Isaiah, Luis M., had been convicted of second-degree sexual assault of a child. For that offense, he received a twenty-year sentence, which was suspended, and he thereafter registered as a convicted sex offender. Amanda testified that she allowed him to return to her home in an effort to "keep a family together." Luis told Amanda that he was not guilty of the crime of which he had been convicted; she testified that she would not have continued to live with him if she were convinced that he was a sex offender.

At the time of trial, Luis had signed adoption petitions as to Isaiah and Brooklyn, agreeing to terminate his parental rights voluntarily upon condition that he would be allowed continued visits and that there would be a direct consent adoption by his mother.

Luis agreed that his visitations with the children would be supervised. As of the time of trial, Brooklyn and Isaiah had been living with their paternal grandmother since May 16, 2002.

**4.** We depart from strict chronological order to explain the case plans in their sequential context.

**5.** The case plan also indicated that Amanda needed to improve her level of cooperation with DCYF.

**6.** All references to testimony in this opinion are to the testimony of witnesses at the termination of parental rights trial in Family Court that commenced on December 3, 2004.

to be provided by Child & Family Services; (2) family services to be provided by Project Early Start (a Child & Family Services program); and (3) family counseling to be provided by the Family Preservation program. Mr. Bernardo testified that Amanda failed to participate in the Family Preservation counseling services while the first case plan was pending. Moreover, although she did attend some parenting classes, Mr. Bernardo testified that she did not comply with DCYF's recommendation that she attend additional parenting classes at Child & Family Services. It was further Mr. Bernardo's testimony that Amanda did not complete the Project Early Start program.

When DCYF presented Amanda with a second case plan on May 3, 2002, referring her to (inter alia) the Family Preservation program, she again refused to sign the case plan, and she told the caseworker that she did not need to work on the issues that the case plan identified. At that point in time, the children were still residing in Amanda's home.

Later in May of 2002, DCYF removed the children ex parte after being informed that Amanda had allowed Luis [7] to supervise the children in her absence and that she had tied Brooklyn and Isaiah to a bedpost as punishment. Brooklyn and Isaiah were placed in the care of their paternal grandmother. The testimony of Mr. Bernardo indicates that the two children have since bonded with their grandmother, who is a pre-adoptive parent. Mr. Bernardo testified as to his observations that Brooklyn interacts and talks openly with her grandmother and that Isaiah seems comfortable and happy and speaks frequently in that environment.

After the children were removed from Amanda's care, subsequent case plans addressed the goal of reunification. A third case plan, dated July 11, 2002, identified the following as among the objectives for Amanda: (1) the improvement of parenting skills; (2) the provision of a safe and stable environment; (3) learning how to supervise appropriately; and (4) meeting the children's housing, medical, mental health, food, clothing, and educational needs. Amanda refused to sign this third case plan, and she did not complete the tasks described therein. Mr. Bernardo testified that he indicated on the case plan the fact that the mother refused to sign it. He testified that Amanda told him she would not sign the case plan because "[s]he didn't trust DCYF and refused to sign documents."

On September 4, 2002, after conducting a hearing on DCYF's allegations of neglect, the Family Court formally committed Brooklyn and Isaiah to the care, custody, and control of DCYF. According to the decree issued by the Family Court on that date, Amanda admitted to the allegation of neglect that DCYF had made in that proceeding. Years later, on June 20, 2005, during the termination of parental rights trial, Amanda testified that, when she had admitted to the neglect of her children, she did not understand the charges that she was facing, adding that she knew very little about the legal system.[8]

After the children were committed to DCYF custody, DCYF continued to prepare case plans for Amanda aimed at reunifying her with her children. Amanda's

---

7. *See* footnote 3, *supra.*

8. At the termination of parental rights trial, Amanda testified that she had been frustrated with her legal representatives and had worked with three different attorneys before hiring her current lawyer, who represented her in the termination of parental rights trial, and who represents her in connection with the present appeal.

fourth case plan, dated February 12, 2003, set forth the same goals as the earlier case plans and added as further requirements: (1) participation in a substance abuse evaluation; (2) mental health maintenance; and (3) abstention from drugs and alcohol. As happened with respect to the earlier case plans, Amanda did not sign this document.

Amanda also refused to sign a fifth case plan, dated September 5, 2003. Mr. Bernardo testified that Amanda did not complete the tasks contained in that case plan; those tasks included maintaining a legal source of income and refraining from the use of drugs and alcohol.

During the termination of parental rights trial, Amanda testified that she did not realize that the purpose of the case plans was to track her progress. Expressing great frustration with DCYF, Amanda testified that she refused to sign some of the case plans because she felt that she had already completed the requirements that the plans imposed on her. She testified as follows:

> "I was already complying and I had already complied with a lot of it. And I felt like they just didn't see that or they just didn't care and they kept writing it down."

Nina Stein, the clinician at Project Early Start to whom Amanda was assigned, testified that, although Amanda seemed familiar with a number of the concepts in the parenting classes referenced in the case plans, her actual parenting skills did not improve during this time because "her own mental health needs interrupted her."

## Visitation, Counseling, and Treatment

Irregularity and challenging communication characterized Amanda's interaction with DCYF and the various service providers at all relevant points in time. After the children were removed from her home, Amanda was homeless throughout most of her subsequent involvement with DCYF. At the time of the termination of parental rights trial, she had not been employed since 2002, when she worked at a real estate agency.[9] Although Amanda sometimes used e-mail at the public library to correspond with Mr. Bernardo, communication was at times rendered difficult due to her lack of a telephone and a home address. In addition, after Mr. Bernardo referred Amanda to the Families Together program of the Providence Children's Museum,[10] the program's clinician experienced difficulty in contacting Amanda, although she did initially cooperate with two intake appointments at the museum. Newport County Mental Health (NCMH) also informed DCYF that Amanda had been inconsistent in keeping her scheduled appointments with that agency.

An analogous irregularity characterized Amanda's visitations with her children while they were in DCYF custody. The fact that she lacked a permanent home, a telephone, and a car contributed to the difficulties that she experienced in connection with those visits. Sometimes Amanda would meet the children at the Newport Public Library, where, according to her testimony, she would wait outside in the cold for the DCYF worker to arrive with her children out of fear that she would miss them if she entered the building, as she testified had happened before. On

9. Amanda testified that her reason for not working is that she had been too upset and unstable to work because she was constantly wondering what was happening with her children.

10. This program is designed to provide transportation and activities for families, and it facilitates visitations between children removed from their homes and their parent or parents.

five or six other occasions, she testified, she arrived for her visits just as the DCYF caseworker was departing with the children. At times, Amanda could not keep her visitation appointments due to the lack of bus money, and in some of those instances she would place a collect call to Mr. Bernardo to inform him of that fact. Initially, DCYF provided Amanda with bus passes, but it did not continue to fund transportation for her after it initiated the termination of parental rights proceeding. Amanda testified that she walked to a number of her visitation appointments in inclement weather. It was further her testimony that she once hitchhiked from Connecticut to attend a visitation appointment with Brooklyn and Isaiah.

Nina Stein worked with Amanda at Child & Family Services from November 27, 2002 until August 28, 2003. Ms. Stein testified that between November and March Amanda kept eleven of her fourteen personal appointments with her. In addition, Amanda received a certificate of completion on October 3, 2003 for having attended nine sessions of Ms. Stein's ten-session parenting class.

Ms. Stein also testified regarding Amanda's comments about her mental health. Specifically, Amanda had told Ms. Stein that she suffered from posttraumatic stress disorder and schizophrenia. Ms. Stein also testified that Amanda reported having experienced suicidal feelings and having been a victim of rape. Ms. Stein coordinated treatment for Amanda at NCMH. After attending one intake appointment, however, Amanda did not return to NCMH because she did not want to take the medication that the NCMH

clinician recommended. Amanda testified that she did not want to take the medication because it "doesn't make the problems go away and make them any easier." Ms. Stein testified that Amanda told her that she was afraid the medication would have a stupefying effect on her.

According to Ms. Stein, Amanda had told her that she felt she was "born drunk" as a result of her own mother's use of alcohol.[11] Ms. Stein testified that she believed a residential treatment facility would be appropriate for Amanda. At trial, Amanda testified that she does not drink or use drugs. She first explained her "born drunk" comment by saying that her Italian family had given her wine as a child; she noted further that, because of prevalent alcoholism in her family, she does not consume alcohol. In June of 2005, during the termination of parental rights trial, Amanda testified that she had not had a drink since New Year's of that year. Ms. Stein testified that Amanda ceased making appointments with her after she told Mr. Bernardo that Amanda had a problem with alcohol. Due to the child age limitations of the program, as well as Amanda's resentment about Ms. Stein's report to Mr. Bernardo, Ms. Stein and Amanda last met in August of 2003.

### The Referral to CODAC

On December 2, 2003, DCYF proceeded to file involuntary termination of parental rights petitions with respect to Brooklyn and Isaiah. These petitions sought to terminate Amanda's parental rights on the basis of G.L.1956 § 15–7–7(a)(2)(iii) (unfitness due to chronic substance abuse problem)[12] and § 15–7–7(a)(3) (twelve months

---

**11.** Amanda had herself been a child in the state foster care system.

**12.** General Laws 1956 § 15–7–7(a)(2)(iii) provides in pertinent part as follows:

"**Termination of parental rights.**—(a) The court shall, upon a petition duly filed by a governmental child placement agency or licensed child placement agency after notice to the parent and a hearing on the

in state custody with no substantial probability of child's safe return to parent within a reasonable period).[13]

While DCYF's petition to terminate Amanda's parental rights was pending, DCYF referred Amanda to CODAC, a substance abuse treatment facility, and she began working with her primary counselor at that agency, Judith Legner, in January of 2004. Amanda attended half of her scheduled meetings at CODAC. She attended four appointments: on January 27, 2004, February 17 and 24, 2004, and March 11, 2004. Ms. Legner testified that Amanda admitted, during her intake session at CODAC, that she had used marijuana and alcohol. In addition, even though Amanda produced a positive screen for cocaine on January 27, 2004, she denied having used that drug. Based on the four sessions that Ms. Legner conducted with Amanda, she concluded that further treatment would aid Amanda, but she could not state conclusively in her trial testimony whether or not Amanda had a substance abuse problem; Ms. Legner testified that a full assessment of a CODAC client usually requires three months of treatment.

Judith Legner's last meeting with Amanda was on March 11, 2004. Amanda testified that she stopped going to CODAC because DCYF would not pay for her appointments, and she further testified that she felt she had complied with all of the DCYF case plans, except for the provisions regarding CODAC. Although Mr. Bernardo testified that Amanda was in a "state-funded slot" for CODAC payment and that DCYF funded the co-payment for counseling and urine screening, he acknowledged in his testimony that once DCYF had filed its petition to terminate Amanda's parental rights, it did not continue to provide her with a funding source.

### The Termination of Parental Rights Trial

The termination of parental rights trial in Family Court began on December 3, 2004. After a total of six trial days,[14] the Family Court justice rendered a bench decision terminating Amanda's parental

petition, terminate any and all legal rights of the parent to the child, including the right to notice of any subsequent adoption proceedings involving the child, if the court finds as a fact by clear and convincing evidence that:

"* * * *

"(2) The parent is unfit by reason of conduct or conditions seriously detrimental to the child; such as, but not limited to, the following:

"* * * *

"(iii) The child has been placed in the legal custody or care of the department for children, youth, and families and the parent has a chronic substance abuse problem and the parent's prognosis indicates that the child will not be able to return to the custody of the parent within a reasonable period of time, considering the child's age and the need for a permanent home. The fact that a parent has been unable to provide care for a child for a period of twelve (12) months due to substance abuse shall consti-

tute prima facie evidence of a chronic substance abuse problem[.]"

13. Section 15–7–7(a)(3) reads as follows:

"(a) The court shall * * * terminate any and all legal rights of the parent to the child * * * if the court finds as a fact by clear and convincing evidence that:

"* * * *

"(3) The child has been placed in the legal custody or care of the department for children, youth, and families for at least twelve (12) months, and the parents were offered or received services to correct the situation which led to the child being placed; provided, that there is not a substantial probability that the child will be able to return safely to the parents' care within a reasonable period of time considering the child's age and the need for a permanent home[.]"

14. The trial was conducted on December 3, 2004, January 14, 2005, March 22, 2005, May 16, 2005, June 20, 2005, and August 1, 2005.

rights on August 1, 2005. On August 4, 2005, Amanda filed a notice of appeal.[15]

The trial justice ultimately found that DCYF had shown by clear and convincing evidence that Amanda was unfit to parent Brooklyn and Isaiah. He stated that the evidence showed that Amanda's "emotional and psychological problems still exist and that there is no end in sight," and he also noted that her financial situation remained insecure; he concluded that these conditions were seriously detrimental to the children's welfare. The trial justice further found that the children were unlikely to be able to return to Amanda's custody within a reasonable period of time, considering their age and their need for a permanent home. The trial justice also found that DCYF had made "all reasonable efforts" to reunify Amanda with Brooklyn and Isaiah. He also ruled that the termination of Amanda's parental rights would be in the best interests of both children. On these grounds, the trial justice terminated Amanda's parental rights.

On appeal, respondent contends that the trial justice erred in granting DCYF's petition to terminate her parental rights. She contends that "numerous factors combin[ed] to magnify the risk of erroneous fact finding." Amanda further asserts that the justice overlooked, misconceived, or misconstrued the evidence and that the evidence does not support a judicial finding that DCYF made "diligent" efforts to effect reunification.[16]

## STANDARD OF REVIEW

■■■ This Court employs a deferential standard in its review of a Family Court decision to terminate parental rights. *In re Kayla N.*, 900 A.2d 1202, 1207–08 (R.I. 2006); *In re Mariah M.*, 899 A.2d 423, 427 (R.I.2006); *In re Shawn M.*, 898 A.2d 102, 106 (R.I.2006). A trial justice's finding concerning the issue of parental fitness *vel non* is entitled to great weight and will not be overturned on appeal unless it is clearly erroneous or the trial justice overlooked material evidence. *See In re Diamond Y.*, 915 A.2d 1283, 1287 (R.I.2007). This Court reviews the record to determine if legally competent evidence supports the trial justice's findings. *In re Kayla N.*, 900 A.2d at 1208.

## ANALYSIS

On appeal, respondent challenges the trial justice's finding that she was unfit as a parent pursuant to the provisions of § 15–7–7(a)(2)(iii) and § 15–7–7(a)(3). She asserts that numerous factors contributed to the risk of erroneous fact-finding by the Family Court when it determined that clear and convincing evidence supported DCYF's allegations.[17]

15. The Family Court's decree was not actually entered until August 17, 2005. However, a prematurely filed notice of appeal in such circumstances is not a bar to review by this Court. *See, e.g., In re Kayla N.*, 900 A.2d 1202, 1206 n. 6 (R.I.2006).

16. In the interest of accuracy, we note that DCYF is required by statute to make "reasonable" efforts, not "diligent" efforts. Section 15–7–7(b)(1) provides in pertinent part as follows:

"In the event that the petition is filed pursuant to subdivisions (a)(1), (a)(2)(i), (a)(2)(iii), or (a)(2)(vii) of this section, the court shall find as a fact that, prior to the granting of the petition, such parental conduct or conditions must have occurred or existed notwithstanding the reasonable efforts which shall be made by the agency prior to the filing of the petition to encourage and strengthen the parental relationship so that the child can safely return to the family."

17. This Court has explained that "due process requires that the state support its allegations by at least clear and convincing evidence" before it may terminate parental rights. *In re Destiny D.*, 922 A.2d 168, 172 (R.I.2007).

In cases such as this, we engage in a three-step process as we review the Family Court's decision. We turn first to the court's finding of parental unfitness; thereafter, we examine its finding as to the reasonable reunification efforts on the part of DCYF. Finally, our review turns to the Family Court's determination concerning the children's best interests.

## I. Parental Fitness

■ Rights to the custody, care, and nurturing of children presumptively lie with the parents; hence, the state must prove parental unfitness before a court will terminate such a natural parent-child relationship. *See In re Kristen B.*, 558 A.2d 200, 203 (R.I.1989); *see also In re Amber P.*, 877 A.2d 608, 615 (R.I.2005). Accordingly, it is now our duty to review the finding of unfitness made by the justice of the Family Court and to determine whether or not that finding was supported by clear and convincing evidence.

■ The respondent contends that the trial court overlooked material evidence regarding the depth of the relationship between her and her children. We do not so view the record. The trial justice heard testimony on this issue, including the testimony of Mr. Bernardo that during visitations Amanda appeared to have good interactions with the children and that they were not afraid of her. Mr. Bernardo described the existing bond between Amanda and the children that he had observed, and the trial justice also heard testimony from Nina Stein concerning Amanda's strong love for her children and her desire to be a good parent. Amanda also testified as to her affection for her children. She testified that during visitations she had good rapport with her children:

"I just go about my normal routine as being a mother with them. Spend time with them on the computer, read books with them, play with them outside, play with them inside, tickle them, give them hugs and kisses, let them know I love them."

The trial justice reached the following conclusion with respect to Amanda's testimony: "I don't doubt that these children care for their mother. Of course they still care for her."

■ After reviewing the record, it is clear to us that respondent loves her children and cares about their well-being. It is well-established, however, that the existence of a bond between a parent and his or her children is not the determinative factor in termination of parental rights proceedings. As we have previously observed, "a parent's genuine love for [the] child, or an existence of a bond between parent and child, is not sufficient to overcome the child's fundamental right to a safe and nurturing environment." *In re Brianna D.*, 798 A.2d 413, 415 (R.I.2002). Indeed, as we recently observed: "The truth is that John Lennon was not entirely correct when he famously declared: 'Love is all you need.'" *In re Kayla N.*, 900 A.2d at 1210 n. 10. The court's assessment of parental fitness in the termination of parental rights context must necessarily go beyond the question of whether the parent cares for the child; the court must focus on the question of parental fitness and not solely on the presence of parental affection.

We have carefully scrutinized the record, and we are convinced that the Family Court's findings with respect to this issue were not clearly erroneous and were supported by clear and convincing evidence. An exchange between Amanda and the trial justice aptly illustrates the issue as the Family Court articulated it:

"THE [RESPONDENT]: I just want my family back.

THE COURT: I understand that. The question is whether you're capable of taking care of your family, and that's what this [trial] is all about."

The trial justice did in fact consider the affection between the parent and the children, and he appropriately balanced this factor against other factors bearing on parental fitness, of which he was aware through the legally competent evidence that had been introduced. We perceive no error.

■ The respondent next argues that the trial justice erred in allowing into evidence Nina Stein's testimony concerning Amanda's psychological and emotional diagnoses. Ms. Stein's testimony summarized those diagnoses as Amanda had related them to her. She specifically did not testify as to any communications made to her by NCMH clinicians regarding the diagnoses, testifying only as to what Amanda told her were the diagnoses. The Family Court justice observed that Ms. Stein's testimony was being offered to explain why she decided to refer Amanda to NCMH. Because Amanda, a party, made the statements at issue, Rule 801(d)(2) of the Rhode Island Rules of Evidence classifies such statements as admissible non-hearsay. As such, they were properly admitted by the Family Court justice.

■ The respondent further contends on appeal that the trial justice improperly qualified Judith Legner as an expert concerning chemical dependency. The respondent contends that the trial justice abused his discretion when he found Ms. Legner to be qualified as an expert; she bases her contention on the fact that Ms.

Legner did not receive her state license until months after she provided services to her. We reject this contention. Our rules of evidence do not stipulate that a license is a prerequisite to testifying as an expert in a particular field. Rule 702 of the Rhode Island Rules of Evidence is quite clear as to the applicable standard for determining the admissibility *vel non* of proposed expert testimony:

> "**Testimony by experts.**—If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of fact or opinion."

We have stated that the controlling inquiry when analyzing the application of this rule is "whether the proffered expert is qualified by virtue of his or her knowledge, skill, experience, training, or education to deliver a helpful opinion to the jury." *State v. Morales,* 621 A.2d 1247, 1249 (R.I. 1993) (internal quotation marks omitted); *see also Beaton v. Malouin,* 845 A.2d 298, 301 (R.I.2004); *Owens v. Payless Cashways, Inc.,* 670 A.2d 1240, 1244 (R.I.1996). Ms. Legner testified as to her education and years of experience in the field, which the trial justice concluded were sufficient to support her qualification as an expert.[18] We conclude that the Family Court justice did not abuse his discretion in qualifying Ms. Legner as an expert and in relying upon her testimony in the course of carrying out his fact-finding responsibilities.

■ The respondent additionally argues on appeal that the trial justice improperly

18. Even though Ms. Legner was not licensed at the time that she assessed Amanda concerning the chemical dependency issue, we note that she had in fact received her license by the time that the termination of parental rights trial was held. Having said that, we do not mean to suggest that possession of a license is always a *sine qua non* before one may testify as an expert at a trial; neither Rule 702 of the Rhode Island Rules of Evidence nor our cases contain such a requirement.

precluded her efforts to disclose alleged harassment of her by Luis and his family. However, the record does not reflect any rulings by the trial justice that limited the respondent's introduction of evidence concerning such alleged harassment. In fact, the record discloses that Amanda was permitted to testify that, when Luis's family did not "get their way with [her] with the kids or anything like that," his family members would place phone calls to DCYF and DCYF would then "investigate and harass [her] and keep on harassing [her]." Amanda was of the opinion that these alleged calls were intended to create difficulty for her and interfere with her progress. Significantly, however, she did not offer any proof that members of Luis's family had placed such calls to DCYF, and the trial justice remarked:

> "Well, it would seem to me whoever called in, it really doesn't matter much, I guess. Some were unfounded, regardless of who had called them in; and some were indicated after an investigation of both situations."

We disagree with Amanda's contention that the trial justice precluded her efforts to detail such alleged harassment, and we further conclude that such contentions would not have been relevant to the Family Court's finding of her unfitness as a parent.

 The respondent next argues that the trial justice erred in failing to take into account her insufficient understanding of the legal consequences of statements made by her. The record indicates, however, that Amanda was represented by counsel when she admitted in September of 2002 that she had neglected her children. She has been represented by three different attorneys during the pendency of this case,

and she never appealed the finding of neglect of September 4, 2002. Having been represented by counsel and not having appealed the finding of neglect, respondent's argument on this issue is unavailing.

 Finally, respondent contends that the Family Court did not give proper consideration to the medical care she provided to her children when it determined that she was an unfit parent. While we recognize that a parent's provision of medical care to his or her children is a relevant factor with respect to the issue of parental fitness, we agree with the trial justice that "[t]he medical records would not show if she's appropriate or inappropriate," and we conclude that this issue is not determinative in this case.

The first of the separate and independent grounds upon which the Family Court's termination of parental rights decision was based was Amanda's chronic substance abuse. *See* § 15–7–7(a)(2)(iii). This Court has defined "chronic," for the purposes of examining an issue of substance abuse, as relating to a disease of long duration with "deep seated and obstinate" symptoms or those that threaten to be of "long continuance." *In re Shawn M.*, 898 A.2d at 107 (internal quotation marks omitted). The respondent asserts that the trial justice failed to adequately take into account Ms. Legner's testimony that she could not conclusively state in her trial testimony whether or not Amanda had a substance abuse problem. While we acknowledge that the evidence of Amanda's substance abuse is not as great as that which we have seen in several other termination of parental rights cases,[19] we would observe that, even if clear and convincing evidence did not support a finding of

---

**19.** *See, e.g., In re Shawn M.*, 898 A.2d 102, 107 (R.I.2006); *In re Tara P.*, 836 A.2d 219, 223 (R.I.2003); *In re Suebun V.*, 766 A.2d 939, 943 (R.I.2001); *In re Maya C.*, 764 A.2d 116, 119 (R.I.2001); *In re Eric K.*, 756 A.2d 769, 772 (R.I.2000).

chronic substance abuse in this case, the Family Court's finding of unfitness stands independently on its second ground.

 The second and independent statutory ground upon which the Family Court's termination of parental rights decision was based was its finding of unfitness due to the fact that the children had been placed in DCYF custody for twelve months or more with no substantial likelihood of return to the parent's care in a reasonable period of time, considering their age and need for a permanent home. *See* § 15–7–7(a)(2)(iii). Amanda did not contest the fact that Brooklyn and Isaiah were in the legal custody of DCYF for at least twelve months. We perceive no error in the Family Court's finding that DCYF offered Amanda several services aimed at correcting the situation that led to their removal, nor do we perceive error in the court's determination that the children's safe return to Amanda's care within a reasonable period of time was not substantially probable. Over and over again, Amanda failed to fully cooperate with DCYF, and she repeatedly failed to sign or participate in case plans that addressed the goal of reunification. At the time of the trial, Amanda's stability and financial security had not improved, despite assistance, and her mental health problems had continued without successful treatment.

We recently affirmed a termination of parental rights case for cognitively limited parents based on testimony that the parents were unlikely to safely parent their daughter. *In re Kayla N.*, 900 A.2d at 1209–10. Despite the parents' efforts to comply with the recommendations of DCYF in that case, the Family Court concluded that reunification was not likely. *Id.* In the instant case, although the facts and circumstances are different from those at issue in *Kayla N.*, the Family Court similarly found that the achievement of reunification was not reasonably likely. Healthcare providers testified as to their inability to complete assessments or provide services due to Amanda's inadequate cooperation and participation. We therefore conclude that the Family Court's finding of unfitness is supportable on these facts.

In summary, we are satisfied that the trial justice did not commit error in finding that clear and convincing evidence supported the state's allegation of parental unfitness. Because legally competent evidence undergirds this finding, we uphold it.

## II. Reasonable Efforts

 A finding of parental unfitness is insufficient in and of itself for the court to terminate parental rights: subsequent to presenting sufficient evidence to support such a finding, DCYF must additionally demonstrate to the Family Court that it has made reasonable efforts to strengthen the parent-child relationship in accordance with the provisions of § 15–7–7(b)(1). *See In re Brianna D.*, 798 A.2d at 413, 415 (upholding termination of parental rights due to chronic substance abuse and twelve months DCYF custody without substantial probability of safe return to parent's care). What constitutes reasonable efforts towards reunification varies with each case; there is no single "rigid standard" that can be set forth in black-letter language. *In re Amber P.*, 877 A.2d at 618. We have stated that "consistent with a totality of the circumstances approach, the efforts required from DCYF to satisfy the reasonable efforts standard vary with the differing capacities of the parents involved." *In re Christopher B.*, 823 A.2d 301, 308 (R.I.2003) (internal quotation marks omitted). Accordingly, we must now consider whether, taking into account

the mother's circumstances, DCYF made sufficient efforts at reunification.

The respondent contends on appeal that the trial justice overlooked and/or misconstrued material evidence in determining that DCYF made reasonable efforts at reunification. Specifically, she asserts that DCYF did not sufficiently encourage the parent-child relationship or work toward reunification and that its efforts to help her establish a stable home, coordinate regular visitations, and attend treatment programs were not reasonable. The respondent contends that the facts did not support a judicial finding that DCYF made "diligent" efforts [20] to reunify the mother and children.

It is clear from the record that Amanda's homelessness complicated the process of arranging visitations and surely made it more difficult for her to cooperate with the caseworkers, clinicians, and agencies that were involved in this matter. Nonetheless, we conclude that DCYF duly considered this circumstance in formulating its plans and made reasonable efforts to reunite Amanda with Brooklyn and Isaiah. DCYF prepared a series of case plans for Amanda that identified goals vital to parental fitness. Those goals included: (1) her attaining mental stability; (2) abstention from drugs and alcohol; and (3) achieving financial security.

In attempting to deal with the difficulties that Amanda's homelessness created, Mr. Bernardo testified that he instructed Amanda to call collect if she were unable to pay for a telephone call to his office. DCYF also provided Amanda with bus passes and RIPTIKS [21] to assist her with

transportation to visitation appointments and to the locations where services were to be provided.[22]

Despite such efforts, Amanda failed to cooperate sufficiently with DCYF in addressing the multiple obstacles she faced in striving towards parental fitness. She refused to sign release forms or case plans, and she chose not to abide by most of the recommendations in the case plans. Moreover, she was inconsistent in utilizing the services that DCYF coordinated. Indeed, Mr. Bernardo testified that one of the reasons motivating DCYF to file the instant termination of parental rights petitions was Amanda's failure to complete the case plans.

Because we are unable to conclude that the efforts made by DCYF in this case were insufficient, we affirm the trial justice's determination that DCYF made reasonable efforts at reunification.

### III. The Best Interests of the Children

■■■■■■■■ Once DCYF has demonstrated parental unfitness and has shown that it made reasonable efforts at reunification, the Family Court then shifts its analysis to consider the best interests of the child or children involved in the proceeding. *See In re Kristina L.*, 520 A.2d 574, 580 (R.I. 1987). At that juncture, the best interests of the child or children outweigh all other considerations. *See id.* We have explained that such best interests include "the right of a minor child to reasonable care and maintenance, freedom from abuse or neglect, and the right to be given an opportunity to spend the remainder of his

---

**20.** *See* footnote 16, *supra.*

**21.** RIPTIKS are bus tickets sold in discount packs of ten.

**22.** DCYF supplied these bus passes and RIPTIKS until such time as it filed the termination of parental rights petition. Mr. Bernardo testified that DCYF policy is to cease providing services and funding once it has filed a petition to terminate parental rights.

or her childhood in a family setting in which the child may grow and thrive." *In re Robert S.*, 840 A.2d 1146, 1151 (R.I. 2004) (internal quotation marks omitted).

In this case, the Family Court appropriately considered the relevant factors in its determination that the children's best interests would be served by their remaining in the care of their grandmother. As the trial justice explained, Brooklyn and Isaiah had, at the time of the trial, lived more than half their lives outside the regular presence of their mother. Two years later, his determination of the children's need for a permanent home resonates even more powerfully.

Despite her efforts, Amanda failed to remedy the problems that were central to DCYF''s concern about her children's well-being, including her lack of stability both financial and emotional. She did not cooperate with DCYF, refusing to sign case plans or follow the recommendations that DCYF and its often-involved agencies provided her. Testimony indicates that Brooklyn and Isaiah are "well-adjusted" to the home of their grandmother and feel they are part of her family.

We perceive no error in the trial justice's determination that the testimony before him demonstrated that termination of the respondent's parental rights would be in the best interests of the children. We therefore uphold the Family Court's decree on this issue.[23]

## CONCLUSION

We have genuine empathy for Amanda, and we are keenly aware of the gravity of a judicial decision to terminate parental rights. Nevertheless, after reviewing the entire record and bearing in mind Amanda's regrettable failures to cooperate with DCYF and with various service providers, we are convinced that the Family Court acted correctly in deciding to terminate the parental rights of Amanda D. with respect to Brooklyn M. and Isaiah D., and we affirm that decree. The record may be remanded to the Family Court.

---

23. Amanda's brief to this Court contains several other contentions. We have reviewed these contentions, and we do not find them persuasive or determinative, nor do we find it necessary to discuss each with particularity.