### In re PRICILLION R.

### No. 2008–176–Appeal.

Supreme Court of Rhode Island.

June 5, 2009.

 

 
 
 
 
 
 

 
 
 
 
 

 

 
 
 

 
 

 
 
 
 
 
 
 
 

 
 

 
 
 
 
 
 

John J. O'Brien, III, Esq., Thomas J. Corrigan, Jr., Esq., for Plaintiff.

Janice Weisfeld, Office of the Public Defender, for Defendant.

Present: GOLDBERG, Acting C.J., FLAHERTY, SUTTELL, ROBINSON, JJ., and WILLIAMS, C.J. (Ret.).

## OPINION

Justice SUTTELL, for the Court.

The respondent, Daryl Renfro, appeals from a Family Court decree terminating his parental rights to his son Pricillion. Mr. Renfro argues that the trial justice erred in finding him to be an unfit parent. We issued an order directing the parties to show cause why the issues raised in this appeal should not be summarily decided. After examining the written and oral submissions of the parties, we are of the opinion that the appeal may be resolved without further briefing or argument. For the reasons hereinafter set forth, we affirm the decree of the Family Court.

### I

### Facts and Procedural History

This case arises out of Mr. Renfro's persistent struggles with alcohol and substance abuse and the damage it has wrought on his ability to care for his son Pricillion, born July 2, 1996.[1] His involvement with the Department of Children, Youth and Families (DCYF) spanned nearly a decade and was marked by periodic episodes of acute intoxication that had a negative impact on his ability to properly supervise his son, and that resulted in the removal of Pricillion from his home and the eventual termination of Mr. Renfro's parental rights. We glean the following

---

1. It appears that Pricillion's mother resided in California for most of his life. The Department of Children, Youth and Families (DCYF) made an attempt to place the child with her through the Interstate Compact for the Placement of Children, but the request was denied. On October 17, 2007, her parental rights to Pricillion were terminated on the ground of abandonment.

facts and background information from the Family Court record and the testimony adduced at trial.

DCYF involvement with Mr. Renfro began in 1999 as the result of allegations that Mr. Renfro had left the then two-year-old Pricillion unsupervised in the backyard for over two hours. A neglect petition subsequently was filed, and the child was placed in the temporary custody of DCYF. Mr. Renfro was compliant with services, and in March 2000 DCYF recommended that the case be closed.

DCYF soon became involved again in May 2000, however, when two anonymous callers alleged that Mr. Renfro had descended into daily intoxication, that his apartment was in terrible condition and smelled of urine, and that Pricillion was subsisting on cereal alone. These reports triggered another investigation that resulted in the filing of a second neglect petition against Mr. Renfro. DCYF later requested that the petition be closed after Mr. Renfro successfully completed a substance abuse evaluation.

The final incident leading to the termination of Mr. Renfro's parental rights occurred in May 2004, when police were alerted that Mr. Renfro was so intoxicated on a public bus while traveling with his son that he was approaching unconsciousness. On June 1, 2004, DCYF filed an *ex parte* neglect petition, and Pricillion was again placed in DCYF temporary custody. On July 19, 2004, DCYF amended its petition to include allegations of dependency, to which Mr. Renfro admitted. The child then was committed to the care, custody, and control of DCYF and allowed to return to his father's care on the condition

that Mr. Renfro cooperate with DCYF services. Specifically, Mr. Renfro was ordered to cooperate with substance abuse counseling, submit to random urine screens, and attend Alcoholics Anonymous (AA) meetings. On December 3, 2004, however, DCYF"s emergency motion for placement was granted based upon a report by hospital staff that Mr. Renfro was visibly intoxicated when he brought Pricillion to the emergency room.[2] Pricillion has not lived with his father since then.

After the child's removal, Mr. Renfro attempted to renew his cooperation with DCYF, participating in drug and alcohol screenings, attending AA meetings, and agreeing to a new case plan. Unfortunately, his successful completion of a treatment program proved to be elusive. He initially attended outpatient treatment at Tri–Hab/Pawtucket Addictions Counseling Services (PACS), but he testified that he "may have" had a positive screen on February 19, 2005. In April 2005, he did complete a one-week alcohol abuse treatment program at Butler Hospital. He then entered an inpatient alcohol treatment program at Talbot House on May 5, 2005. Mr. Renfro testified that he was within one week of successfully completing the program when he was discharged for violating a conduct rule.

Throughout the period, Mr. Renfro continued to struggle with his sobriety. His visitation rights were restricted in March 2005, after he was arrested for domestic violence.[3] Thereafter, he was only permitted to visit Pricillion outside of his home and with DCYF supervision. In July, Mr. Renfro tested positive for cocaine during a visit with Pricillion, and his visits were

---

**2.** Even before this incident, Mr. Renfro was struggling to maintain his sobriety. At trial, he acknowledged that he had two positive screens for cocaine after Pricillion had been returned to his care.

**3.** DCYF alleged that Mr. Renfro was intoxicated at the time of his arrest; however, the domestic violence charge was later dismissed.

further restricted to take place only at DCYF's office. In December 2005, he was discharged from PACS for noncompliance because of positive cocaine screens, missed appointments, and continuous "excuses." In September 2006, Mr. Renfro entered a treatment program at the Providence Center, but he was discharged for noncompliance in part because of allegations that he offered cocaine to another program participant. In May 2007, he referred himself to CODAC, a substance abuse treatment center, where he produced a positive screen for cocaine on May 10, 2007. Also, records were introduced into evidence indicating that Mr. Renfro had been participating in drug and alcohol testing at the Family Court since July 2004. His last positive Family Court screening was for cocaine on August 5, 2005.

After filing and then withdrawing a petition to terminate parental rights in June 2006 and July 2007, respectively, DCYF filed a second petition on August 29, 2007. The petition alleged that Mr. Renfro had a chronic substance abuse problem, that the child had been placed in the legal custody and care of DCYF for at least twelve months, and that there was not a substantial probability of reunification within a reasonable period. On October 2, 2007, the trial justice interviewed Pricillion *in camera*. Pricillion told the justice that he enjoyed living in a group home because they planned fun activities such as go-cart racing. When the justice asked him whether he wanted to see his father again, Pricillion seemed to hesitate, then he stated he did not "so much" like the idea of living with his father again. Instead, he told the justice that he hoped to be adopted and was looking forward to being in a family.

The trial commenced on February 1, 2008. Mr. Renfro testified that he was not intoxicated the day he was arrested on a public bus in May 2004, and he attributed his behavior to his diabetes. He acknowledged responsibility for failing to complete several substance abuse programs, saying, "it was my fault for breaking the rules." He stated that he no longer was in treatment because his health insurance carrier had refused to cover further treatment and DCYF had declined to intervene on his behalf. Mr. Renfro further acknowledged that it was "totally unreasonable" for him to abuse substances given his belief that reunification was in the best interests of Pricillion. He said that he had maintained his sobriety for a sustained period, noting that his last positive drug screen occurred in May 2007 when he reentered treatment at CODAC, and that he had abstained from alcohol for over a year. He also disputed the accuracy of that May 2007 positive screen and said that he would have demanded a retest had he the financial means to do so.

The trial justice rendered his decision from the bench on March 25, 2008. While acknowledging Mr. Renfro's "obvious" love of his son, he found that it was equally clear that Mr. Renfro had struggled with alcohol and substance abuse for many years. Though Mr. Renfro had maintained his sobriety in recent months, his struggles had kept Pricillion out of the home for a long period. He stated, "[h]opefully, the father is going to continue to remain clean, but I've got a child that's like on a yo-yo." The trial justice found that DCYF custody had extended beyond the statutory twelve-month period and concluded that Pricillion and Mr. Renfro would not be reunited within a reasonable length of time. Accordingly, the trial justice found, by clear and convincing evidence, that Mr. Renfro was

> "unfit by reason of conduct or conditions seriously detrimental to the child, in that the child has been placed in the legal

custody or care of the Department of Children, Youth & Families; * * * and the father's prognosis indicates that the child will not be able to return to the custody of the father within a reasonable period of time, considering the child's age and need for a permanent home. " * * *

"This Court finds also that the Department exercised all reasonable care and made all reasonable efforts here to reunite this father and child. The testimony is that, at the present time, this child is ready to be released from this group home, that there is a preadoptive home waiting for him. The child indicates that that is his desire.

"For all of the foregoing reasons, the Court finds the father unfit; further finds that, in the opinion of this Court, it's in the best interest of this child that the father's rights be terminated, and they are hereby terminated."

The termination decree was entered on April 4, 2008, from which Mr. Renfro timely appealed.

## II

### Standard of Review

■ On appeal, "[t]his Court reviews termination of parental rights rulings by examining the record to establish whether the [Family Court] justice's findings are supported by legal and competent evidence." *In re Ariel N.*, 892 A.2d 80, 83 (R.I.2006) (citing *In re Rene B.*, 544 A.2d 137, 140 (R.I.1988)). These findings are entitled to great weight and will not be disturbed on appeal "unless the [trial] justice overlooked or misconceived material evidence, or was otherwise clearly wrong." *In re Isabella C.*, 852 A.2d 550, 555 (R.I. 2004). "Natural parents have a fundamental liberty interest in the 'care, custody, and management' of their children." *In re Destiny D.*, 922 A.2d 168, 172 (R.I.2007)

(quoting *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)). The trial justice must find that the parent is unfit before terminating parental rights. *Id.* "The natural parent's right to due process requires that the state support its allegations by at least clear and convincing evidence." *In re Victoria L.*, 950 A.2d 1168, 1174 (R.I.2008). "After the trial justice determines parental unfitness, 'the best interests of the child outweigh all other considerations.'" *Id.* (quoting *In re Destiny D.*, 922 A.2d at 173).

## III

### Discussion

■ When reviewing a Family Court justice's termination of parental rights, we engage in a three-step process. *In re Brooklyn M.*, 933 A.2d 1113, 1122 (R.I. 2007). First, we must evaluate the court's finding of parental unfitness. *Id.* Next, we consider whether DCYF made reasonable efforts at reunification. *Id.* Finally, we review whether termination is in the best interests of the child. *Id.*

We have no reason to doubt the trial justice's conclusion that Mr. Renfro loves Pricillion deeply, but we have often observed that "a parent's genuine love for [the] child, or an existence of a bond between parent and child, is not sufficient to overcome the child's fundamental right to a safe and nurturing environment." *In re Brianna D.*, 798 A.2d 413, 415 (R.I.2002). We turn then to the trial justice's application of the statute governing termination of parental rights, specifically G.L.1956 § 15–7–7 subsections (a)(2)(iii) and (a)(3). The relevant portions of subsection (a) allow a trial justice to terminate parental rights only upon clear and convincing evidence that

"(2)(iii) The child has been placed in the legal custody or care of the depart-

ment for children, youth, and families and the parent has a chronic substance abuse problem and the parent's prognosis indicates that the child will not be able to return to the custody of the parent within a reasonable period of time, considering the child's age and the need for a permanent home. The fact that a parent has been unable to provide care for a child for a period of twelve (12) months due to substance abuse shall constitute prima facie evidence of a chronic substance abuse problem[.]

" * * *

"(3) The child has been placed in the legal custody or care of the department for children, youth, and families for at least twelve (12) months, and the parents were offered or received services to correct the situation which led to the child being placed; provided, that there is not a substantial probability that the child will be able to return safely to the parents' care within a reasonable period of time considering the child's age and the need for a permanent home[.]"

Our examination of the record in this case reveals substantial support for each of the trial justice's rulings.

█ On appeal, Mr. Renfro challenges the trial justice's finding of unfitness on the basis of a chronic substance abuse problem, contending that he "had, at the time of trial, conquered his past substance abuse problems." There can be no question, however, that the record is replete with instances of Mr. Renfro's long-standing alcohol and substance abuse. We previously have defined the term chronic as "[w]ith reference to diseases, of long duration, or characterized by slowly progressive symptoms; deep seated and obstinate, or threatening a long continuance * * *." *In re Shawn M.*, 898 A.2d 102, 107 (R.I. 2006) (quoting *In re Tara P.*, 836 A.2d 219, 223 (R.I.2003) and Black's Law Dictionary

241–42 (6th ed. 1990)). Sadly, Mr. Renfro's struggles with alcohol and substance abuse fit squarely within that definition. Since 1999, Mr. Renfro participated in a host of drug and alcohol treatment programs with little success. Mr. Renfro has at times sabotaged his own recovery by failing to adhere to the rules of treatment. There was evidence adduced at trial of a positive screen for cocaine as recently as May 2007, less than one year before the trial. Moreover, the record reflects that Mr. Renfro often failed to attend scheduled screening appointments. We also are mindful that Mr. Renfro frequently concealed and minimized his substance abuse in the past.

Although Mr. Renfro quite accurately notes that the trial justice is required to consider all the evidence up to the termination hearing, including recent success in maintaining sobriety, we repeatedly have stated that termination may nevertheless be appropriate despite sobriety at the time of trial. *See, e.g., In re Marcella,* 834 A.2d 717, 719 (R.I.2003); *In re Crystal C.,* 765 A.2d 842, 843–45 (R.I.2001); *In re Maya C.,* 764 A.2d 116, 118–19 (R.I.2001). Mr. Renfro's evasiveness during his hearing testimony reveals a continuing lack of insight into his behavior. Given his long history of substance abuse, we cannot say that the trial justice's finding of chronic substance abuse was "clearly wrong" or that he misconceived material evidence.

█ The trial justice also found that DCYF had retained custody of Pricillion well beyond the statutory twelve-month period and that there was no substantial likelihood of his return within a reasonable time. The trial justice articulated his concern for the lack of stability in Pricillion's life, likening it to being "on a yo-yo." Mr. Renfro had exhausted numerous opportunities to regain custody of Pricillion. We perceive no error in the trial justice's de-

termination that, considering the child's age and need for a permanent home, there was not a substantial probability that reunification could be accomplished within a reasonable period.

 Next we must consider whether DCYF made reasonable efforts to reunite Mr. Renfro with Pricillion. We have said that there is no single "rigid standard" for making this determination and these efforts must be evaluated on a case-by-case basis. *In re Brooklyn M.*, 933 A.2d at 1125. DCYF created four case plans with the central purpose of supporting Mr. Renfro in attaining parental fitness. It supervised visitations after it removed Pricillion from the home in an effort to preserve the parental relationship, although, according to the social caseworker, Mr. Renfro sometimes acted inappropriately during visitations. Significantly, DCYF made numerous referrals to substance abuse treatment programs on behalf of Mr. Renfro. It was only after several years of involvement, in which Pricillion was removed from the home and Mr. Renfro continued to struggle with drug and alcohol abuse, that DCYF modified its goal from unification to termination. Accordingly, we are satisfied that DCYF met its burden to make reasonable efforts at reunification.

 Finally, we must consider whether the trial justice's determination that parental termination was in Pricillion's best interests was clearly erroneous. The best interests of the child includes consideration of "the [child's] right to be given an opportunity to spend the remainder of his or her childhood in a family setting in which the child may grow and thrive." *In re Brooklyn M.*, 933 A.2d at 1126 (quoting *In re Robert S.*, 840 A.2d 1146, 1151 (R.I.2004)). Although the issue before the court, after a finding of unfitness, is whether termination is in the child's best interests, rather than what the child prefers, we do not deem it error for a trial justice to consider the desire of an eleven-year-old child for permanency in his life. Accordingly, we hold that the trial justice was not clearly wrong in finding that termination was in the best interests of the child.

## IV

### Conclusion

For the reasons set forth in this opinion, we affirm the decree of the Family Court and remand the record of the case thereto.